WILLIAM MONKS, APPELLANT, v. NEW JERSEY STATE
  PAROLE BOARD AND HAROLD J. ASHBY, CHAIRMAN,
  RESPONDENTS.

Argued March 8, 1971—Decided May 10, 1971.

*Mr. Anthony G. Amsterdam,* a member of the District of Columbia bar, argued the cause for appellant (*Mr. Richard Newman and Mr. George E. Pollard,* attorneys; *Mr. Jack Himmelstein,* a member of the New York bar, of counsel).

*Mr. Alfred L. Nardelli,* Deputy Attorney General, argued the cause for respondents (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

Jacobs, J. The State Parole Board rejected the appellant's request for a statement of its reasons for denial of parole to him. He filed notice of appeal to the Appellate Division which dismissed his appeal as untimely. His petition for certification was granted by this court 57 *N. J.* 292 (1970).

In 1957 the appellant William Monks, then 15 years of age, was adjudicated a juvenile delinquent for offenses which, if he had been 18 or older, would have constituted murder in the first degree, robbery and atrocious assault and battery. He was committed to the Bordentown Reformatory. His period of confinement was indeterminate, to continue until the appropriate authority decided that he should be paroled though not beyond the maximum provided by law with respect to an adult. *N. J. S. A.* 2A:4–37; *In re State In Interest of Steenback,* 34 *N. J.* 89, 99 (1961); *In re Smigelski,* 30 *N. J.* 513, 526 (1959). Because of disciplinary problems at Bordentown, Mr. Monks was trans-

ferred on May 31, 1967 to the New Jersey State Prison where he is now confined.

Within a four-month period subsequent to the transfer, the Parole Board conducted its initial hearing in Mr. Monks' case and denied parole. It rescheduled the matter for a further hearing in two years. On further hearing, the Board on September 16, 1969 again denied parole and scheduled rehearing for September 1971. The notice to Mr. Monks set forth no reasons for the Board's decision and simply noted that "parole has been denied regardless of the availability of a suitable parole plan." On October 4, 1969 Mr. Monks wrote a letter to the Board in which he said that he would like to know what was necessary to convince the Board that he was "a good parole risk"; that if the Board could be good enough to give him "some idea of the reasons" for its action he would be in a position to behave in any way the Board expected; that he wanted to do whatever he could "to be released at the earliest possible time"; and that if a reconsideration was possible he would like to mention that he had "a very good job waiting" for him and also "a home to live" in with his brother and sister-in-law. In response to this letter the Board notified Mr. Monks on October 21, 1969 that his case had been studied again and that the Board was of the opinion "that there should be no change in the prior determination that parole should be denied and that you should be scheduled for a further hearing in September 1971."

On January 5, 1970 Mr. Amsterdam, an attorney who had been designated by the United States Supreme Court to represent Mr. Monks in a legal proceeding unrelated to the parole matter before us (*Monks v. New Jersey,* 395 *U. S.* 942, 89 *S. Ct.* 2021, 23 *L. Ed.* 2d 461 (1969); 398 *U. S.* 71, 90 *S. Ct.* 1563, 26 *L. Ed.* 2d 54 (1970)), wrote a letter to Mr. Harold J. Ashby, Chairman of the Parole Board. In his letter Mr. Amsterdam pointed out that Mr. Monks was unclear as to why he had been denied parole since he felt that his behavior since his transfer to State Prison had been

"such as to warrant favorable consideration." Mr. Monks wondered whether there is some damaging information in the Board's files which is "legitimately subject to question or refutation" and whether "there is some way in which his prison behavior should be changed, so as favorably to impress the Board." Mr. Amsterdam renewed Mr. Monks' request "for some explanation of the considerations that moved the Board to deny him parole," pointing out that he could not effectively counsel Mr. Monks and aid in his rehabilitation without knowing "what sorts of considerations" are considered relevant by the Board to the parole determination.

On January 13, 1970 Mr. Ashby replied to Mr. Amsterdam declining to say anything with respect to the reasons for the denial of parole to Mr. Monks. He did however state that "as a matter of policy," the Board does not give reasons, citing New Jersey decisions as holding that it was under no legal obligation to do so. *Mastriana v. N. J. Parole Bd.*, 95 *N. J. Super.* 351 (*App. Div.* 1967) ; *Puchalski v. N. J. State Parole Board*, 104 *N. J. Super.* 294 (*App. Div.*), *aff'd* 55 *N. J.* 113 (1969), *cert. denied*, 398 *U. S.* 938, 90 S. Ct. 1841, 26 *L. Ed.* 2d 270 (1970) ; see also *Madden v. New Jersey State Parole Board*, 438 *F.* 2d 1189 (3 *Cir.* 1971). Mr. Ashby's letter closed with a statement that if Mr. Amsterdam desired to discuss the matter further an appointment would be arranged. On March 2, 1970 Mr. Ashby met with Messrs. Newman and Himmelstein, acting as additional counsel for Mr. Monks, and the substance of their meeting was set forth in a letter dated March 23, 1970 to Mr. Ashby which concluded with "a final request" that he furnish the information sought. On March 31, 1970 Mr. Ashby replied, citing *N. J. S. A.* 30:4-123.14 and repeating his earlier assertion that the reasons for denial of parole "need not be revealed." Mr. Ashby did not suggest that there were circumstances special to Mr. Monks' case which would call for withholding reasons from him, apart from the Board's general policy, and our own examination of the Parole Board's file indicate that there were none.

242

■ Treating the March 31, 1970 letter as the Board's final decision or action within the contemplation of *R.* 2:2–3(a), the appellant filed his notice of appeal to the Appellate Division. The respondents moved to dismiss on the ground that the appeal was not taken within the prescribed 45-day period from the denial of parole on September 16, 1969. See *R.* 2:4–1(b). The Appellate Division dismissed the appeal as untimely, apparently rejecting the appellant's position that his appeal was not from the denial of parole on September 16, 1969 but only from the denial of his request for reasons which, he contends, did not become final until March 31, 1970. See *DeNike v. Bd. of Trustees, Employees Ret. System of N. J.,* 34 *N. J.* 430, 433–436 (1961); *Schack v. Trimble,* 28 *N. J.* 40, 49 (1958); *Lettieri v. State Board of Medical Examiners,* 24 *N. J.* 199, 206 (1957). We granted certification not because of the timeliness question but because we were concerned with whether a parole denial should not in this age be accompanied by a fair statement of reasons. We shall therefore pass the timeliness issue and proceed to the merits, noting however that in any event Mr. Monks has a viable right to seek a declaration as to the validity of the Board's general policy of not stating reasons, a policy which does not rest on any express statutory provision but is embodied in a formal administrative Parole Board rule designated 11:70–54. *Cf. Cole Nat. Corp. v. State Bd. of Examiners,* 57 *N. J.* 227 (1970); *McKenna v. N. J. Highway Authority,* 19 *N. J.* 270 (1955).

■ The Parole Board has broad but not unlimited discretionary powers. The pertinent legislation (*N. J. S. A.* 30:4–123.1 *et seq.*) sets forth guidelines and under our special constitutional structure (*N. J. Const.,* art. VI, sec. 5, para. 4 (1947)) the Board's actions are always judicially reviewable for arbitrariness. See *In re State In Interest of Steenback, supra,* 34 *N. J.* at 100–101; *In re Smigelski, supra,* 30 *N. J.* at 527–528. The Legislature has directed the Board not to release on parole merely as a reward for good conduct but only if it is of the opinion that "there is reason-

able probability" that the prisoner will assume his proper and rightful place in society, without violation of law, and that his release "is not incompatible with the welfare of society." *N. J. S. A.* 30:4–123.14. The Department of Institutions and Agencies and the chief executive officers and staffs of the various correctional institutions are directed to cooperate and furnish reports with respect to the prisoner to the Board which, in turn, is directed to receive and maintain records (*N. J. S. A.* 30:4–123.17, 18) and to "consider the merits of his parole" and make such "investigation as it shall deem necessary and proper." *N. J. S. A.* 30:4–123.9.

Before reaching a final decision, the Board is directed to have the prisoner appear before it and "personally interview him to consider his ultimate fitness for parole, and verify as far as possible, the information furnished it from other sources." *N. J. S. A.* 30:4–123.19. There is no legislative provision for counsel at the interview (*cf.* Kadish, "The Advocate and the Expert — Counsel in the Peno-Correctional Process," 45 *Minn. L. Rev.* 803 (1961); Jacob and Sharma, "Justice After Trial: Prisoners' Need for Legal Services in the Criminal-Correctional Process," 18 *Kan. L. Rev.* 493 (1970); Comment, "Due Process: The Right to Counsel in Parole Release Hearings," 54 *Iowa L. Rev.* 497 (1968)) although there is legislative provision that when it becomes necessary for the prisoner to appear before the Board "for the purpose of determining his fitness for parole" he "shall have the right to consult legal counsel of his own selection, if he feels that his legal rights are invaded," and subject to the Board's consent "to submit in writing a brief or other legal argument on his behalf." *N. J. S. A.* 30:4–123.25. See *Puchalski v. N. J. State Parole Board, supra,* 104 *N. J. Super.* at 299, 55 *N. J.* at 115.

Professor Kadish has suggested that determinations by the parole board are "in some measure equivalent to the sentencing determinations of the judge" since "decisions on both levels turn on a discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is

and what he may become rather than simply what he has done." Kadish, *supra*, 45 *Minn. L. Rev.* at 812–13. But he quickly acknowledges that under the decided cases the prisoner's constitutional rights at sentencing go far beyond his rights at the parole interview or hearing. *Cf. Mempa v. Rhay*, 389 *U. S.* 128, 88 *S. Ct.* 254, 19 *L. Ed.* 2d 336 (1967); Cohen, "Sentencing, Probation and the Rehabilitative Ideal: The View from Mempa v. Rhay," 47 *Texas L. Rev.* 1 (1968). Thus we have recognized the prisoner's broad right at sentencing to have counsel who, under *State v. Kunz*, 55 *N. J.* 128 (1969), is afforded fair and timely opportunity of examining a copy of the presentence report on which the sentence is largely based; and we have also recognized that, with the aid of his counsel, the prisoner may readily appeal and pursue an attack on the trial judge's exercise of his sentencing discretion. See *State v. Laws*, 51 *N. J.* 494, 497–501, *cert denied*, 393 *U. S.* 971, 89 *S. Ct.* 408, 21 *L. Ed.* 2d 384 (1968).

In contrast to the foregoing, we have thus far not recognized any right to counsel at the parole interview or hearing. *Cf. Puchalski v. N. J. State Parole Board, supra,* 55 *N. J.* 113; see *Menechino v. Oswald,* 430 *F.* 2d 403 (2 *Cir.* 1970); *Schawartzberg v. United States Board of Parole,* 399 *F.* 2d 297 (10 *Cir.* 1968); *Briguglio v. N. Y. State Bd. of Parole,* 24 *N. Y.* 2d 21, 298 *N. Y. S.* 2d 704, 246 *N. E.* 2d 512 (1969). Mr. Monks does not here assert such right to counsel nor does he here question the manner in which his interview or hearing was actually conducted; as already indicated, he merely seeks a statement of reasons, so that he may properly be guided in connection with his future conduct and with his forthcoming parole rehearing scheduled for September 1971.

When dealing with administrative agencies generally we have long pointed to the need for suitable expression of the controlling findings or reasons. Thus in *Abbotts Dairies v. Armstrong,* 14 *N. J.* 319 (1954), we stressed that findings were of the utmost importance "not only in insuring a re-

sponsible and just determination" by the agency but also "in affording a proper basis for effective judicial review." 14 *N. J.* at 332–333; see *Bergsma v. Town of Kearny,* 24 *N. J. Super.* 43, 47 *(App. Div.* 1952); *Family Finance Corp. v. Gough,* 10 *N. J. Super.* 13, 24 *(App. Div.* 1950); *cf. Fanwood v. Rocco,* 33 *N. J.* 404, 416 (1960). Similarly in *Securities and Exchange Com. v. Chenery Corporation,* 318 *U. S.* 80, 63 *S. Ct.* 454, 87 *L. Ed.* 626 (1943), Justice Frankfurter noted that the orderly process of judicial review requires that the grounds for the administrative agency's action be clearly disclosed by it. 318 *U. S.* at 94, 63 *S. Ct.* at 462, 87 *L. Ed.* at 636. See *Davis, Administrative Law* § 16.12, *p.* 585 (1970 Supp.): "One of the best procedural protections against arbitrary exercise of discretionary power lies in the requirement of findings and reasons that appear to reviewing judges to be rational."

In *Drown v. Portsmouth School District,* 435 *F.* 2d 1182 (1 *Cir.* 1970), the Court of Appeals for the First Circuit recently sustained a request for a statement of reasons though it found no constitutional ground for additional relief. A non-tenure teacher who had not been rehired at the expiration of her annual contract sought but was denied a statement of reasons and a hearing at which she could challenge them. Citing *Cafeteria & Restaurant Workers Union, Local 473, A.F.L.-C.I.O. v. McElroy,* 367 *U. S.* 886, 81 *S. Ct.* 1743, 6 *L. Ed.* 2d 1230 (1961) and *Goldberg v. Kelly,* 397 *U. S.* 254, 90 *S. Ct.* 1011, 25 *L. Ed.* 2d 287 (1970), the court noted that in determining what procedures were required, the competing interests of the individual teacher and the school board must be duly balanced. 435 *F.* 2d at 1184. It found that the teacher's interests in knowing the reasons for her nonretention were indeed substantial and that the disadvantages in supplying them were indeed slight; it found further, however, that the full evidentiary hearing sought by the teacher would be unduly burdensome to the school system and was not fairly called for on a weighing of all of the pertinent considerations. It concluded that,

while the teacher was not entitled to the hearing she sought, she should nonetheless constitutionally be furnished with a statement of reasons. 435 *F.* 2d at 1185–1188; *cf. Roth v. Board of Regents of State Colleges,* 310 *F. Supp.* 972, 979–980 (*W. D. Wis.* 1970); Frakt, "Non-Tenure Teachers and the Constitution," 18 *U. Kan. L. Rev.* 27, 39 (1969); Van Alstyne, "The Constitutional Rights of Teachers and Professors," 1970 *Duke L. J.* 841, 870–74.

The need for fairness is as urgent in the parole process as elsewhere in the law and it is evident to us that, as a general matter, the furnishing of reasons for denial would be the much fairer course; not only much fairer but much better designed towards the goal of rehabilitation. The Corrections Task Force has pointed out that well conducted parole hearings tend desirably to increase "the involvement of inmates in the decisions which affect them and to confront them more directly with the information upon which a decision is being made." President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: Corrections, p.* 64 (1967). Favorable reference is made to the increasing number of parole boards, including, among others, those in Minnesota and Iowa, which have adopted "the practice of calling inmates back after a hearing to discuss the decision on their cases." *Id.* at 65. Professor Dawson reports that in Michigan and Wisconsin "the parole boards are careful to explain to the inmate the reason for the decision reached" and "to suggest what, if anything, the inmate can do to improve his chances for parole later." Dawson, "The Decision to Grant or Deny Parole: A Study of Parole Criteria in Law and Practice," 1966 *Wash. U. L. Q.* 243, 302. He also reports that statements of the reasons are placed in the inmates' files and that although the statements are quite brief, "the necessity for making them requires some reflection on the grounds for the decision." *Id.* at 302.

In response to inquiries from our Attorney General, the Parole Board of Pennsylvania has advised that brief writ-

ten reasons have been furnished by it for the last 15 years to prisoners on denial of parole, and the Parole Board of Connecticut has advised that prior to January 1, 1969 written reasons had been given to prisoners but that a procedural revision took effect as of that date. Under its revised practice the Connecticut Board, at the conclusion of the conference with the inmate, excuses him and then makes its decision in executive session. He is then recalled and is advised of the board's decision, and if there has been a denial, "the reasons for the denial." The board's letter to the Attorney General states that sometimes "it is difficult to explain the reasons for the denial" particularly when the denial is the result of information in the psychiatric evaluation and its disclosure might endanger future psychiatric services; but such special situations could of course be dealt with specially in the formulation of an administrative disclosure rule or policy. See *Davis, Discretionary Justice* 131 (1969) : "I think that justice requires that a prisoner be told the reasons for a denial of parole, with rare exceptions, as when a psychiatric condition otherwise requires. Withholding reasons is likely to harm the rehabilitation process. Statement of findings and reasons will not assure fairness of the decision, but it will pull in that direction."

In his critical discussion of the operations of the United States Parole Board, Professor Davis points to various administrative deficiencies, though our concern here is solely with his comments on the board's policy of not stating reasons for denial of parole. *Discretionary Justice, supra,* 126 *et seq.* In that connection he stresses not only that the policy adversely affects the prisoner's rehabilitation (*p.* 128) but also that it disregards the recognized "advantages of openness" (*p.* 129) and leads to the likelihood that abuses of discretion will "go uncorrected" (*p.* 128). Similarly, Professor Dawson in his study of parole law and practice stresses not only the need for legal reviewing mechanisms but, more pointedly, the need for improvement of the board procedures themselves so that society can "be assured that official dis-

cretion is being exercised fairly and sensibly." Dawson, *supra*, 1966 *Wash. U. L. Q.* at 303. Only recently did the English establish a parole system ("Criminal Justice Act," 31 *Modern L. Rev.* 16, 35 (1968)) and it has understandably brought forth academic comment. See, *e. g.*, Samuels, "Parole: A Critique," 1969 *Crim. L. Rev. (Eng.)* 456. Mr. Samuels, Senior Lecturer in Law, University of Southhampton, points out that a "simple, bald rejection" of parole necessarily increases "uncertainty and frustration and disillusionment and morbid speculation in the prisoner." He recommends that reasons always be given "shortly and simply, except where the Board expressly for good reasons decides otherwise, *e. g.*, where it would manifestly not be in the prisoner's best interests, perhaps because of psychological matters or family matters." Samuels, *supra*, 1969 *Crim. L. Rev. (Eng).* at 459.

Our judicial system has historically been vested with the comprehensive prerogative writ jurisdiction which it inherited from the King's Bench; that jurisdiction has been frequently exercised in the supervision of inferior governmental tribunals including administrative agencies. See the very early cases of *State v. Justices, &c., of Middlesex*, 1 *N. J. L.* \*244 (*Sup. Ct.* 1794), where Chief Justice Kinsey described the jurisdiction "as unlimited and universal as injustice and wrong can be" (at \*248), and *Ludlow v. Executors of Ludlow*, 4 *N. J. L.* \*387 (*Sup. Ct.* 1817), where Chief Justice Kirkpatrick described it as "very high and transcendent" (at \*389) ; and also the more recent cases of *Fischer v. Twp. of Bedminster*, 5 *N. J.* 534 (1950), where Justice Heher noted that the "inherent power of superintendence of inferior tribunals" (at 560) was secured by the 1844 Constitution and could not be impaired by the Legislature, and *McKenna v. N. J. Highway Authority*, *supra*, 19 *N. J.* 270, where Justice Burling noted that the prerogative writ jurisdiction included not only the review of "judicial actions" but also the superintendence of civil corporations, magistrates and "other public officers." (at 274). When our

1947 Constitution was prepared, pains were taken to insure not only that the court's prerogative writ jurisdiction would remain intact, but also that the manner of its exercise would be greatly simplified (art. VI, sec. 5, para. 4). See *Ward v. Keenan*, 3 *N. J.* 298, 303–308 (1949). The implementing court rules now provide an easy mode of review designed to insure procedural fairness in the administrative process and to curb administrative abuses. See *In re Masiello*, 25 *N. J.* 590, 603 (1958) ; *Elizabeth Federal S. & L. Ass'n. v. Howell*, 24 *N. J.* 488, 499 (1957).

■ In *White v. Parole Board of State of N. J.*, 17 *N. J. Super.* 580 (*App. Div.* 1952), a modern counterpart of the ancient writ proceeding, the prisoner's attack on his parole board classification was rejected, but in his opinion for the Appellate Division Justice Brennan suggested that, constitutional compulsions aside, proper procedural safeguards on vital classification issues are called for by "considerations of simple fairness." 17 *N. J. Super.* at 586. So here, fairness and rightness clearly dictate the granting of the prisoner's request for a statement of reasons. That course as a general matter would serve the acknowledged interests of procedural fairness and would also serve as a suitable and significant discipline on the Board's exercise of its wide powers. It would in nowise curb the Board's discretion on the grant or denial of parole nor would it impair the scope and effect of its expertise. It is evident to us that such incidental administrative burdens as result would not be undue; the reported experiences in the jurisdictions which have long furnished reasons have given us no grounds for pause.

The Board's rule (11:70–54) states flatly that it will not reveal the basis for a denial either in the notice of denial or otherwise; because of the views expressed earlier in this opinion we find the rule invalid and it is now nullified. It should be replaced at an early date by a carefully prepared rule designed generally towards affording statements of reasons on parole denials, while providing for such reasonable exceptions as may be essential to rehabilitations and the

sound administration of the parole system. In the meantime, the Board is directed to grant Mr. Monks' request for a statement of the reasons for the denial of his parole. The judgment of dismissal entered in the Appellate Division is hereby:

Reversed.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.