NEW JERSEY STATE PAROLE BOARD, RESPONDENT, v.
JAMES BYRNE, APPELLANT.

TONY MAPLES, APPELLANT, v. CHRISTOPHER DIETZ, NEW
JERSEY STATE PAROLE BOARD, RESPONDENTS.

Argued January 11, 1983—Decided May 11, 1983.

*Jane Ellen Haburay,* Assistant Deputy Public Defender, argued the cause for appellant James Byrne (*Joseph H. Rodriguez,* Public Defender, attorney).

*M. Virginia Barta,* Assistant Deputy Public Defender, argued the cause for appellant Tony Maples (*Joseph H. Rodriguez,* Public Defender, attorney).

*Lyle P. Hough, Jr.,* Deputy Attorney General, argued the cause for respondents (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

These appeals question the constitutionality of the method by which defendants were given half-step reductions of the advanced parole eligibility dates otherwise granted to previously sentenced multiple offenders under the Parole Act of 1979, *N.J.S.A.* 30:4–123.45 to –123.69 (*L.*1979, *c.* 441) (hereinafter "Parole Act"). Specifically, defendants challenge *N.J.S.A.* 30:4–123.51(j), which allows a sentencing judge or prosecutor to block a full-step reduction for a multiple offender without explanation by advising the Parole Board that the punitive aspects of the original sentence have not yet been fulfilled. We hold that the interests defendants claim are "liberty" interests protected by the Due Process Clause of the Fourteenth Amendment, and that the method employed lacks the necessary due process. Therefore, we remand the causes to the Parole Board for further proceedings.

I

Under the parole law in effect at the time these defendants were sentenced, first, second, third and fourth offenders became eligible for parole after having served one-third, one-half, two-thirds or four-fifths of their maximum sentences less credits, respectively. *N.J.S.A.* 30:4–123.10; *N.J.S.A.* 30:4–123.12 (*L.* 1948, *c.* 84, §§ 10, 12) (repealed).

The Parole Act of 1979 changed the scheme by providing that the parole eligibility date for multiple offenders would now be computed as if they had committed one fewer prior offense— i.e., a second offender would be treated as a first offender, a third offender as a second offender, and a fourth offender as a

third offender. This "full-step" reduction in the parole eligibility date would not be granted, however, if the prosecutor or sentencing judge advised that the punitive aspects of the sentence had not yet been fulfilled. In that instance, the inmate would receive only a "half-step" reduction—i.e., the inmate would not become eligible for parole "until serving an additional period which shall be one half of the difference between the primary parole eligibility date calculated pursuant to this subsection and the primary parole eligibility date calculated pursuant to section 12 of P.L.1948, c. 84 (C. 30:4–123.12)." The act further provided that the advice of the prosecutor or sentencing judge "need not be supported by reasons" and "shall not be subject to judicial review except to the extent mandated by the New Jersey and United States Constitutions." *N.J.S.A.* 30:4–123.51(j).[1]

---

[1]The full text of the section is as follows:

Except as provided in this subsection, each inmate sentenced pursuant to N.J.S. 2A:113–4 for a term of life imprisonment, N.J.S. 2A:164–17 for a fixed minimum and maximum term or N.J.S. 2C:1–1(b) shall not be primarily eligible for parole on a date computed pursuant to this section, but shall be primarily eligible on a date computed pursuant to P.L.1948, c. 84 (C. 30:4–123.1 et seq.), which is continued in effect for this purpose. Inmates classified as second, third or fourth offenders pursuant to section 12 of P.L.1948, c. 84 (C.30:4–123.12) shall become primarily eligible for parole after serving one-third, one-half or two-thirds of the maximum sentence imposed, respectively, less in each instance commutation time for good behavior and credits for diligent application to work and other institutional assignments; provided, however, that if the prosecuting attorney or the sentencing court advises the board that the punitive aspects of the sentence imposed on such inmates will not have been fulfilled by the time of parole eligibility calculated pursuant to this subsection, then the inmate shall not become primarily eligible for parole until serving an additional period which shall be one half of the difference between the primary parole eligibility date calculated pursuant to section 12 of P.L.1948, c. 84 (C.30:4–123.12). If the prosecuting attorney or the sentencing court advises the board that the punitive aspects of the sentence have not been fulfilled, such advice need not be supported by reasons and will be deemed conclusive and final. Any such decision shall not be subject to judicial review except to the extent mandated by the New Jersey and United States Constitutions. The board shall, reasonably

## II

Defendant Byrne is serving a sentence of 15 to 17 years imposed in 1976 in Passaic County for armed robbery. He has three prior convictions: 1967, atrocious assault and battery; 1969, escape; and 1972, larceny and illegal use of credit cards. Under the Parole Act, as a fourth offender he would, if granted a full-step reduction, become eligible for parole after serving two-thirds of his sentence instead of four-fifths.

■ Defendant Maples is serving a sentence of 10 to 12 years imposed in 1979 in Monmouth County for possession of drugs with intent to distribute, and a concurrent 4 to 5 year term for simple possession relating to the same incident. He was classified as a second offender because he had served time in State Prison for a previous offense,[2] and was to serve one-half of his sentence before being eligible for parole. Under the Parole Act, a full-step reduction would make him eligible after he served one-third of his sentence.

In each case the Parole Board advised the sentencing court and the prosecutor of their right to object to the proposed full-step reduction. Neither judge replied. Both prosecutors advised denial of full-step reduction. The Parole Board complied.

Both defendants appealed to the Appellate Division. That court disposed of *Byrne* first. *New Jersey State Parole Board v.*

---

prior to considering any such case, advise the prosecuting attorney and the sentencing court of all information relevant to such inmates' parole eligibility. [*N.J.S.A.* 30:4–123.51(j) ].

[2]Maples asserts that *N.J.S.A.* 30:4–123.51(c), rather than *N.J.S.A.* 30:4–123.-51(j), should determine his eligibility date. *N.J.S.A.* 30:4–123.51(c) provides that offenders sentenced to a specific term of years under the Controlled Dangerous Substances Act, *N.J.S.A.* 24:21–1 to –45, become eligible for parole after serving one-third of their sentences. *N.J.S.A.* 30:4–123.51(j), quoted *ante* at 197 n. 1, provides specifically for parole eligibility dates for multiple offenders. The Appellate Division affirmed the Parole Board's application of *N.J.S.A.* 30:4–123.51(j). We also affirm.

*Byrne,* 182 *N.J.Super.* 540 (1982). It held that the Parole Act and the process afforded thereunder were constitutional, finding that the act created only a "possibility of parole" and not a constitutionally-protected "liberty interest" within the meaning of *Greenholtz v. Nebraska Penal Inmates,* 442 *U.S.* 1, 99 *S.Ct.* 2100, 60 *L.Ed.2d* 668 (1979). It also found that the Legislature must have intended to distinguish between repeat offenders who had committed "serious" crimes and those who had committed "less serious" crimes. The court upheld this classification against defendant's equal protection claim. 182 *N.J.Super.* at 552. Finally, it observed that a statement of reasons why the punitive aspect of the sentence was unfulfilled "would only state the obvious—that the punitive aspects of the sentence have not been fulfilled," *id.* at 553, and that its absence was of no legal consequence. The Appellate Division decided *Maples* on the basis of *Byrne* in an unreported opinion.

We granted certification in both cases. 91 *N.J.* 531 (1982).

## III

■ The threshold question is whether the loss of a full-step reduction in parole eligibility time "implicates a liberty interest that is protected by the Due Process Clause" of the federal Constitution. *Vitek v. Jones,* 445 *U.S.* 480, 487, 100 *S.Ct.* 1254, 1261, 63 *L.Ed.2d* 552, 561 (1980) (transfer of prisoners to mental institutions involves protected liberty interest). We hold that it does.

In a series of decisions commencing with *Morrissey v. Brewer,* 408 *U.S.* 471, 92 *S.Ct.* 2593, 33 *L.Ed.2d* 484 (1972), the Supreme Court has sketched the outlines of what constitutes a protected liberty interest for criminal offenders in the contexts of probation, parole and prison. Justice White traced that development in *Vitek:*

There is no "constitutional or inherent right" to parole, *Greenholtz v. Nebraska Penal Inmates,* 442 *U.S.* 1, 7, [99 *S.Ct.* 2100, 2103–2104], 60 *L.Ed.2d* 668 (1979), but once a State grants a prisoner the conditional liberty properly dependent on the observance of special parole restrictions, due process protections attach to

the decision to revoke parole. *Morrissey v. Brewer,* 408 *U.S.* 471, 92 *S.Ct.* 2593, 33 *L.Ed.*2d 484 (1972). The same is true of the revocation of probation. *Gagnon v. Scarpelli,* 411 *U.S.* 778, 93 *S.Ct.* 1756, 36 *L.Ed.*2d 656, 71 *Ohio Ops* 2d 279 (1973). In *Wolff v. McDonnell,* 418 *U.S.* 539, 94 *S.Ct.* 2963, 41 *L.Ed.*2d 935, 71 *Ohio Ops* 2d 336 (1974), we held that a state-created right to good-time credits, which could be forfeited only for serious misbehavior, constituted a liberty interest protected by the Due Process Clause. We also noted that the same reasoning could justify extension of due process protections to a decision to impose "solitary" confinement because "[it] represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct." [Citation]. Once a State has granted prisoners a liberty interest, we held that due process protections are necessary "to insure that the state-created right is not arbitrarily abrogated." [Citation].

In *Meachum v. Fano,* 427 *U.S.* 215, 96 *S.Ct.* 2532, 49 *L.Ed.*2d 451 (1976), and *Montanye v. Haymes,* 427 *U.S.* 236, 96 *S.Ct.* 2543, 49 *L.Ed.*2d 466 (1976), we held that the transfer of a prisoner from one prison to another does not infringe a protected liberty interest. But in those cases transfers were discretionary with the prison authorities, and in neither case did the prisoner possess any right or justifiable expectation that he would not be transferred except for misbehavior or upon the occurrence of other specified events. Hence, "the predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff v. McDonnell* [was] totally nonexistent." [Citation].

Following *Meachum v. Fano* and *Montanye v. Haymes,* we continued to recognize that state statutes may grant prisoners liberty interests that invoke due process protections when prisoners are transferred to solitary confinement for disciplinary or administrative reasons. *Enomoto v. Wright,* 434 *U.S.* 1052, 98 *S.Ct.* 1223, 55 *L.Ed.*2d 756 (1978), summarily affg 462 *F.Supp.* 397 (N.D.Cal.1976). Similarly, in *Greenholtz v. Nebraska Penal Inmates,* supra, we held that state law granted petitioners a sufficient expectancy of parole to entitle them to some measure of constitutional protection with respect to parole decisions. [445 *U.S.* at 488–89, 100 *S.Ct.* at 1261–1262, 63 *L.Ed.*2d at 562].

In the course of these cases, the Court articulated the standard for whether process is due in different ways. In *Morrissey,* the most conceptually sweeping of these decisions, Chief Justice Burger rejected the long discredited "right"-"privilege" distinction, and stated:

"Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.' [Citations]. The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." [408 *U.S.* at 481, 92 *S.Ct.* at 2600, 33 *L.Ed.*2d at 494].

Two years later in *Wolff v. McDonnell*, 418 *U.S.* 539, 94 *S.Ct.* 2963, 41 *L.Ed.*2d 935 (1974), the Court characterized the loss of good-time credits as a state-created right, which "has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Id.* at 557, 94 *S.Ct.* at 2975, 41 *L.Ed.*2d at 951.

In *Meachum v. Fano*, 427 *U.S.* 215, 96 *S.Ct.* 2532, 49 *L.Ed.*2d 451 (1976), the Court refocused its attention upon the nature of the state-created right, ruling that a Massachusetts prisoner had no protectible right to remain in the prison originally assigned, where state law gave prison officials broad discretion to transfer prisoners. It "reject[ed] . . . the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause." *Id.* at 224, 96 *S.Ct.* at 2538, 49 *L.Ed.*2d at 458. The Court found the claimed interest "too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." *Id.* at 228, 96 *S.Ct.* at 2540, 49 *L.Ed.*2d at 461. The Court recently reaffirmed this concept in the context of an interstate transfer. *Olim v. Wakinekona*, —— U.S. ——, 103 *S.Ct.* 1741, 75 *L.Ed.*2d 813 (1983).

The most important articulation, for our purposes, appears in *Greenholtz*, which dealt with the specific issue of parole. That opinion echoed the once rejected distinction between right and privilege by emphasizing the difference between the "discretionary parole *release* from confinement and *termination* of parole." 442 *U.S.* at 9, 99 *S.Ct.* at 2105, 60 *L.Ed.*2d at 677 (emphasis in original). It went on to reject the claim that a protected interest arises whenever the state provides for the possibility of parole. "That the state holds out the *possibility* of parole provides no more than a mere hope that the benefit will be obtained. [Citation]. To that extent the general interest as-

serted here is no more substantial than the inmate's hope that he will not be transferred to another prison, a hope which is not protected by due process." *Id.* at 11, 99 *S.Ct.* at 2105, 60 *L.Ed.*2d at 677–78 (emphasis in original) (citing *Meachum*). Thus the *Greenholtz* Court found that the prisoner's "general interest" was not protected by the full panoply of rights afforded in *Morrissey.*

But more importantly for us the Court found that the language of the state parole statute did create a protected right. That statute provided that when a prisoner is eligible for parole, the Parole Board "*shall order* his release" unless it shall find certain facts (emphasis added).[3] The Court emphasized that the interest was created by parole standards that are "essentially factual . . . rather than predictive," and analogized this statutory right to the protected, state-created right of good-time credits found in *Wolff.* 442 *U.S.* at 12, 99 *S.Ct.* at 2106, 60 *L.Ed.*2d at 678. But it cautioned that the language of each statute must be viewed on a case-by-case basis. *Id.,* 99 *S.Ct.* at 2106, 60 *L.Ed.* 2d at 678–79.

In a recent opinion in this area, the Court relied on regulatory language paralleling that in *Greenholtz* in finding that the authorities could not place a prisoner in administrative segrega-

---

[3]The language of the Nebraska Parole Act was:

Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it shall order his release unless it is of the opinion that his release should be deferred because:

(a) There is a substantial risk that he will not conform to the conditions of parole;

(b) His release would depreciate the seriousness of his crime or promote disrespect for law;

(c) His release would have a substantially adverse effect on institutional discipline; or

(d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date. [*Neb.Rev.Stat.* § 83–1, 114(1) (1976), *quoted in Greenholtz,* 445 *U.S.* at 11, 99 *S.Ct.* at 2106, 60 *L.Ed.*2d at 678].

tion without due process. *Hewitt v. Helms*, —— *U.S.* ——, ——, 103 *S.Ct.* 864, 871, 74 *L.Ed.2d* 675, 688 (1983). The Court found that the state statutes and regulations gave prisoners a liberty interest in remaining in the general prison population.

 The critical inquiry here is whether our statute "creates a legitimate expectation of [eligibility] absent the requisite finding that . . . the justification[ ] for deferral exists." *Greenholtz,* 442 *U.S.* at 12, 99 *S.Ct.* at 2106, 60 *L.Ed.2d* at 678. Measured by that standard, we hold that the Parole Act creates "a sufficient expectancy of parole [eligibility] to entitle [prisoners] to some measure of constitutional protection with respect to parole [eligibility] decisions." *Vitek,* 445 *U.S.* at 489, 100 *S.Ct.* at 1262, 63 *L.Ed.2d* at 562.[4]

We reach this conclusion because of the manner in which our State-guaranteed "system for the granting of parole," *N.J. Const.* (1947), Art. V, § II, par. 2, has been provided by the new act.[5] In *In re Trantino Parole Application,* 89 *N.J.* 347 (1982),

---

[4]*Connecticut Bd. of Pardons v. Dumschat,* 452 *U.S.* 458, 101 *S.Ct.* 2460, 69 *L.Ed.2d* 158 (1981), and *Jago v. Van Curen,* 454 *U.S.* 14, 102 S.Ct. 31, 70 *L.Ed.* 2d 13 (1981), are not inconsistent with this holding. As Justice Brennan observed:

> [A] statistical likelihood of obtaining [parole] . . . is not enough to create a protectible liberty interest. Rather, [prisoners] must also show—by reference to statute, regulation, administrative practice, contractual arrangement or other mutual understanding—that particularized standards or criteria guide the State's decisionmakers. [*Dumschat,* 452 *U.S.* at 467, 101 *S.Ct.* at 2465, 69 *L.Ed.2d* at 166–67 (Brennan, J., concurring) ].

In *Dumschat,* the respondents proved the "statistical likelihood," but not the "particularized standards or criteria." In *Jago,* the Court rejected "mutually explicit understanding" as a basis for a liberty interest. The liberty interest that we find here springs from the statute itself, not from any "understanding."

[5]Because the State statute creates the protected expectancy in parole, we need not debate whether there is substantive content to the liberty and property clauses of the federal Constitution. *See, e.g.,* Michelman, "Process and Property in Constitutional Theory," 30 *Clev.St.L.Rev.* 577 (1982). Justice Stevens has observed how difficult it is to find these phrases devoid of content. "[I]f the inmate's protected liberty interests are no greater than the

we reviewed in detail the history and purposes of the act. We restate those considerations in less detail.

Under prior law, sentences did not directly determine eligibility for parole. A complex of factors and computations required by statute, administrative regulations and institutional rules and practices governed the amount of time an inmate was required to serve in prison before he was entitled to parole consideration. *N.J.S.A.* 30:4–123.16 (repealed). *See, e.g., Cain v. New Jersey State Parole Bd.,* 78 *N.J.* 253 (1978); *Bonilla v. Heil,* 126 *N.J.Super.* 538 (App.Div.1974). Those standards did not consider whether the punitive aspects of inmates' sentences had been satisfied. Further, the parole decision itself was intensely discretionary. It involved not only the likelihood of recidivism but also the inmate's ability to assume a responsible role in society. *N.J.S.A.* 30:4–123.14 (repealed). *See Monks v. New Jersey State Parole Bd.,* 58 *N.J.* 238 (1971). Thus, under the former parole system, the sufficiency of punishment exerted great influence on parole determinations. The Parole Board was required to assess whether the inmate had served enough time in prison and been sufficiently punished in terms of both society's need for adequate punishment and the inmate's individual progress toward rehabilitation. *See, e.g., Beckworth v. New Jersey State Parole Bd.,* 62 *N.J.* 348, 353 (1973).

The current Code and Parole Act sharply contrast with the previous scheme. They impose a new sentencing structure in which the sentence ranges for most offenses are more clearly drawn. *See* Assembly Judiciary, Law, Public Safety and Defense Committee Statement, Assembly No. 3093 (December 3, 1979). The Code enumerates specific mitigating and aggravating factors that the sentencing judge must consider, to depart from the presumed sentence. *N.J.S.A.* 2C:44–1(a), (b), and (f).

---

State chooses to allow, he is really little more than the slave described in the 19th century cases." *Meachum,* 427 *U.S.* at 233, 96 *S.Ct.* at 2542, 49 *L.Ed.*2d at 464 (Stevens, J., dissenting).

Moreover, although fitness for parole remains a determination for parole authorities to make, parole *eligibility* is now a function of the sentence received. In effect, setting the parole eligibility date has become a judicial responsibility to be exercised at the time of sentencing and within the bounds set by the Legislature. The courts can require offenders to serve mandatory minimum terms before they can be considered for parole. *See, e.g., N.J.S.A.* 2C:11–3(b); *N.J.S.A.* 2C:43–6.

Our State's parole process has also undergone significant changes. In recognition of the more definite and severe sentences provided by the Code, the Legislature reduced the discretion involved in parole decisions. The act, in effect, eliminated the conventional parole discretion relating to adequacy of punishment, and transferred it substantially to the judiciary as a function of its sentencing authority. The longer sentences and mandatory minimum terms anticipated under the Code are presumed to ensure that the punitive aspects of the inmate's sentence will be satisfied by the time the parole eligibility date arrives. Hence, the new statute provides only that a prisoner "shall be released on parole at the time of parole eligibility, unless ... there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time." *N.J.S.A.* 30:4–123.53(a).[6] The legislation shifts the burden to the State to prove that the prisoner is a recidivist and should not be released.

---

[6]The Parole Act provides that parole eligibility dates for pre-Code sentenced inmates are governed by the former statute. *N.J.S.A.* 30:4–123.51(j). *See N.J.S.A.* 30:4–123.10 to –123.12 (repealed). In *Trantino,* we focused on this glaring difference between the two classes of inmates.

> Inmates serving sentences under the Code—post-Code inmates—will have presumptively satisfied all punitive aspects of their sentences at the time they become eligible for parole. This is not true of pre-Code inmates. The punitive aspects of their sentences will not necessarily have been fulfilled by the time parole eligibility has occurred. [89 *N.J.* at 370].

*N.J.S.A.* 30:4–123.51(j) and 30:4–123.53(a) combine to create the liberty interest here. The former provides that repeat offenders "shall become primarily eligible for parole after serving [specified portions of their sentences]; provided, however, that if the prosecuting attorney or the sentencing court advises the [parole] board that the punitive aspects of the sentence imposed on such inmates will not have been fulfilled by [that time]," eligibility shall be deferred. This statutory language parallels the language that the *Greenholtz* Court found created a protected expectation in that case. *See also Hewitt,* —— *U.S.* at ——, 103 *S.Ct.* at 871, 74 *L.Ed.2d* at 688; *Connecticut Bd. of Pardons v. Dumschat,* 452 *U.S.* 458, 466–67, 101 *S.Ct.* 2460, 2465, 69 *L.Ed.2d* 158, 166 (1981). We therefore find that the statute creates a legitimate expectation of parole eligibility.[7]

 The language of *N.J.S.A.* 30:4–123.53(a), quoted above, contains the same "shall . . . unless" phrasing as in *Greenholtz.* Applying once again the teaching of *Greenholtz, Dumschat* and *Hewitt,* we hold that this statute creates a protected expectation of parole in inmates who are eligible for parole. Taken together, therefore, *N.J.S.A.* 30:4–123.51(j) and 30:4–123.53(a) create in multiple offenders a liberty interest in parole and, as in *Greenholtz,* due process must attend the deferral or denial of that interest.

By making repeat offenders an exception to the parole eligibility dates in the Parole Act, which occur earlier in time than did the parole eligibility dates of the former statute, *N.J.S.A.* 30:4–123.51(j), the Legislature recognized that under the Parole Act of 1979 a parole eligibility date creates a legitimate expectation of release in the language of *Greenholtz* absent findings

---

[7] *Wolff v. McDonnell,* 418 *U.S.* 539, 94 *S.Ct.* 2963, 41 *L.Ed.2d* 935 (1974), also supports this result. The good-time credits in which the Court found a protected interest had the effect of advancing prisoners' parole eligibility dates. The statute at issue here does the same thing in a more direct way. Since its language tracks that of the statute in *Greenholtz* and provides the same right as in *Wolff,* it follows that the statute creates a protected interest.

that justification for deferral exists. Based upon this interpretation of our statute, we find that a federally-protected liberty interest exists.[8]

Finding a protected liberty interest in this context also comports with our decisional parole and prison law. In *Monks,* this Court said:

> [Constitutional compulsions aside,] fairness and rightness clearly dictate the granting of the prisoner's request for a statement of reasons. That course as a general matter would serve the acknowledged interests of procedural fairness and would also serve as a suitable and significant discipline on the Board's exercise of its wide powers. [58 *N.J.* at 249].

In *Avant v. Clifford,* 67 *N.J.* 496, 520 (1975), we noted:

> While we consider here procedural due process in its constitutional sense, it should also be remembered that in the exercise by New Jersey courts of their function of review (as here) of the action of administrative agencies (such as the Department of Institutions and Agencies), we have not been satisfied with enforcement of naked constitutional right, but have gone further to strike down arbitrary action and administrative abuse and to insure procedural fairness in the administrative process. [Footnote omitted].

Although in both cases the Court invoked a supervisory power short of constitutional due process, the decisions are grounded in the duty of this Court to discharge faithfully its constitutional review of actions of government agencies. *See Southern Burlington Cty. NAACP v. Mount Laurel Tp.,* 92 *N.J.* 158 (1983).

---

[8]Federal circuit courts have adopted a similar analysis. The federal parole board statute, 18 *U.S.C.A.* § 4206(a) (Supp.1982), provides that inmates who are eligible for parole *shall* be released *if* certain conditions are met. This language creates the same liberty interests as were found in *Greenholtz. Solomon v. Elsea,* 676 *F.*2d 282 (7th Cir.1982); *Evans v. Dillahunty,* 662 *F.*2d 522 (8th Cir.1981). *But see Page v. United States Parole Comm'n,* 651 *F.*2d 1083, 1086 (5th Cir.1981) (court did not, however, compare statutory language to that of Nebraska statute in *Greenholtz* ).

The Missouri statute also creates a legitimate entitlement to parole. *Williams v. Missouri Bd. of Probation & Parole,* 661 *F.*2d 697 (8th Cir.1981), *cert.* den., 455 *U.S.* 993, 102 *S.Ct.* 1621, 71 *L.Ed.*2d 855 (1982). It provides that *when* certain guidelines are met the inmate *shall* be released on parole. The court held that this language "gives rise to the same protectible entitlement as the Nebraska scheme providing that the prisoner *shall* be paroled *unless* certain findings are made." *Id.* at 699 (emphasis in original).

We observe that we have generally been more willing to find State-created interests that invoke the protection of procedural due process than have our federal counterparts. In *Greenholtz,* 442 *U.S.* at 7, 11, 99 *S.Ct.* at 2103–2104, 2105–2106, 60 *L.Ed.2d* at 675, 677, the Supreme Court relied on *Board of Regents v. Roth,* 408 *U.S.* 564, 92 *S.Ct.* 2701, 33 *L.Ed.2d* 548 (1972), which held that a nontenured teacher did not have a property interest in his job sufficient to have reasons stated for his nonrenewal. In contrast, we have held, on state law grounds, that a nontenured teacher should be given a statement of reasons for such a decision. *Donaldson v. North Wildwood Bd. of Educ.,* 65 *N.J.* 236 (1974); *see also Nicoletta v. North Jersey District Water Supply Comm'n,* 77 *N.J.* 145, 161 (1978) (State impairment of future employment implicates a liberty interest).

We agree with the proposition that there is no constitutional right to parole. *Greenholtz,* 442 *U.S.* at 7, 99 *S.Ct.* at 2103–2104, 60 *L.Ed.2d* at 675; *Trantino,* 89 *N.J.* at 363 n. 5. The New Jersey Constitution guarantees only that "[a] system for the granting of parole shall be provided by law." *N.J. Const.* (1947), Art. V, § II, par. 2. This provision does not guarantee a liberty interest. But it is undeniable that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Greenholtz,* 442 *U.S.* at 18, 99 *S.Ct.* at 2109, 60 *L.Ed.2d* at 682–83 (Powell, J., concurring in part and dissenting in part).

We therefore believe that the prisoner's liberty interest in freedom at the end of the parole process, implicated by the advanced eligibility date created by *N.J.S.A.* 30:4–123.51, is sufficient to invoke the procedural protections hereinafter outlined.

IV

Once it is determined that due process applies, the question remains what process is due. The United States Su-

preme Court has described due process as an "elusive concept
.... [whose] exact boundaries are undefinable." *Hannah v.
Larche,* 363 *U.S.* 420, 442, 80 *S.Ct.* 1502, 1514, 4 *L.Ed.*2d 1307,
1321 (1960). Due process is flexible and calls for such procedur-
al protections as the particular situation demands. "[C]onsider-
ation of what procedures due process may require under any
given set of circumstances must begin with a determination of
the precise nature of the government function involved as well
as of the private interest that has been affected by governmen-
tal action." *Morrissey,* 408 *U.S.* at 481, 92 *S.Ct.* at 2600, 33
*L.Ed.*2d at 494 (quoting *Cafeteria & Restaurant Workers Union
v. McElroy,* 367 *U.S.* 886, 895, 81 *S.Ct.* 1743, 1748–1749, 6 *L.Ed.*
2d 1230, 1236 (1961)).

Our State view of what process is due is similar. In *Callen v.
Sherman's Inc.,* 92 *N.J.* 114 (1983), we stressed that due process
is a "dynamic concept," *id.* at 136, and that its "sense of fairness
cannot be imprisoned in a crystal," *id.* at 134.

The decisions of the Supreme Court as to what process is due
in the prison, parole and probation contexts offer guidance. In
*Morrissey,* the Court addressed due process at a parole revoca-
tion hearing. It required that a parolee receive (1) written
notice of the claimed violations of parole; (2) disclosure of
evidence against him; (3) opportunity to be heard and to present
witnesses and documentary evidence; (4) the right to confront
and cross-examine adverse witnesses (unless the hearing exam-
iner specifically finds good cause for disallowing it); (5) a
"neutral and detached" hearing body; and (6) a written state-
ment by the fact finders as to the evidence relied upon and
reasons for revoking parole. 408 *U.S.* at 489, 92 *S.Ct.* at 2604, 33
*L.Ed.*2d at 499.

*Gagnon v. Scarpelli,* 411 *U.S.* 778, 93 *S.Ct.* 1756, 36 *L.Ed.*2d 656
(1973), applied the *Morrissey* standards to probation revocation
hearings and added the requirement of the appointment of
counsel when fundamental fairness so requires. *Id.* at 782, 790,
93 *S.Ct.* at 1759, 1763–1764, 36 *L.Ed.*2d at 661–62, 666.

In *Wolff,* the Court recognized that within the prison setting, the claim of good-time credits could be fairly handled if the prisoner received (1) sufficient advance notice of the charges; (2) a fair hearing; and (3) following the hearing, a statement of reasons. 418 *U.S.* at 563–65, 94 *S.Ct.* at 2978–2979, 41 *L.Ed.*2d at 955–56.[9]

In the context of initial parole decisions, *Greenholtz* required an opportunity for the prisoner to be heard and an explanation as to why he fell short of qualifying for parole. 442 *U.S.* at 16, 99 *S.Ct.* at 2108, 60 *L.Ed.*2d at 681. In essence, this means notice, opportunity to be heard and a statement of reasons.

Most recently, the Court held that the process due a prison inmate whom the authorities seek to place in administrative segregation consists of notice of the charges against him and an opportunity for him to be heard by the official who decides whether to transfer him. *Hewitt,* —— *U.S.* at ——, 103 *S.Ct.* at 873, 874, 74 *L.Ed.*2d at 691.

 In each of these contexts, the Court has weighed the interests of the offender against the interests of the State. *See Mathews v. Eldridge,* 424 *U.S.* 319, 335, 96 *S.Ct.* 893, 903, 47 *L.Ed.*2d 18, 33 (1976). Few can disagree that "[i]t is self-evident that all individuals possess a liberty interest in being free from physical restraint." *Greenholtz,* 442 *U.S.* at 23, 99 *S.Ct.* at 2111–2112, 60 *L.Ed.*2d at 685 (Marshall, J., dissenting in part). The State too has an interest in a correct parole eligibility decision. As Chief Justice Burger has written in the context of parole revocation:

The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal

---

9In *Vitek,* involving transfer from a prison to a mental institution, the Court required notice, hearing by an independent factfinder, and a written statement of evidence and reasons. 445 *U.S.* at 494–96, 100 *S.Ct.* at 1264–1265, 63 *L.Ed.* 2d at 566–67. Only four Justices would have required counsel. *Id.* at 496–97, 100 *S.Ct.* at 1265–1266, 63 *L.Ed.*2d at 567 (Brennan, White, Marshall and Stevens, JJ.).

and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions. See *People ex rel. Menechino v. Warden,* 27 N.Y.2d 376, 379 and n. 2 [318 *N.Y.S.2d* 449, 450, and n. 2], 267 N.E.2d 238, 239 and n. 2 (1971) (parole board had less than full picture of facts). And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness. [*Morrissey,* 408 *U.S.* at 484, 92 *S.Ct.* at 2601–2602, 33 *L.Ed.2d* at 496].

Although the State's interest here is confined to the relatively straightforward question of whether the punitive aspects of the sentence have been fulfilled, it is not inconceivable that so simple an error as confusion of identity or offense committed might cause a prisoner to lose a full-step reduction. In addition, the joint interests of society and the prisoner in basic fairness require some measure of protection from gross miscarriages of justice and totally arbitrary action. In deciding whether a particular procedure is required, therefore, we must focus on whether it will significantly reduce these risks in parole eligibility proceedings. *Greenholtz,* 442 *U.S.* at 14, 99 *S.Ct.* at 2107, 60 *L.Ed.2d* at 680.

█ Only a few, basic procedures are required to deal with the risks of erroneous or arbitrary determinations in this context. We conclude that the process required is notice of the pendency of the parole disposition, a statement by the objecting judge or prosecutor of the reasons why the punitive aspects of the sentence have not been fulfilled, and the opportunity for the prisoner to respond in writing to that statement of reasons. No hearing, confrontation, or counsel issues are implicated here.

█ Such statement of reasons would comport with the sentencing scheme for post-Code offenders, *see ante* at 204–205, and parallel the Code's requirements that sentencing judges state the reasons for sentences imposed, *N.J.S.A.* 2C:43–2(e), and specify aggravating factors when sentences depart from the presumptive mode, *N.J.S.A.* 2C:44–1(f). In the legislative scheme, it would not be the Parole Board's function to evaluate the recommendation of the judge or prosecutor. It

should carry out that recommendation. Since the Parole Act prohibits judicial review except to the extent mandated by state or federal Constitutions, such judicial review would be confined to the exercise of appellate review in lieu of prerogative writ provided by *N.J. Const.* (1947), Art. VI, § V, par. 4. *Ward v. Keenan,* 3 *N.J.* 298, 303–08 (1949).[10] The test for appellate review would be whether the Parole Board's refusal to advance the parole eligibility date results in a sentence that is "manifestly excessive under the particular circumstances of the case." *State v. Whitaker,* 79 *N.J.* 503, 512 (1979) (quoting *State v. Leggeadrini,* 75 *N.J.* 150, 157 (1977)).

## V

Having decided that the statutory procedure fails to provide the process due under the federal Constitution, we must determine the effect upon the statute. When we have believed that it would accord with the Legislature's intention, we have construed legislation to include constitutionally-required procedural guarantees. In *Callen,* we read into the State's commercial distraint statute a requirement of notice and the opportunity to be heard. 92 *N.J.* at 134–37. *See also Right to Choose v. Byrne,* 91 *N.J.* 287, 311–12 (1982); *Jordan v. Horsemen's Benevolent & Protective Ass'n,* 90 *N.J.* 422, 435–37 (1982); *United States Chamber of Commerce v. State,* 89 *N.J.* 131, 151–54 (1982); *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 75–80 (1980).

We are confident that the Legislature would choose to include the necessary procedural revisions in the parole eligibility statute rather than eliminate the provision. The legislation itself

---

[10]It may be suggested that this judicial power should be exercised by independent judicial review of the action of the inferior public officer, be it judge or prosecutor, under the *certiorari* standards of arbitrary exercise of power. We believe that litigation collateral to the parole proceedings would conflict with the legislative purpose of a swift, simple, but fair determination of parole eligibility.

signaled this intention by providing that judicial review would be permitted only to the extent required by federal or state Constitutions. This provision reflects the Legislature's awareness of the changing dimensions of the constitutional protections. The Parole Act, although contemplated for a long time, moved through the Legislature rapidly in the last days of the 1979 session. As originally introduced, the legislation did not provide for the sentencing court or prosecutor to deny a reduction in parole eligibility time. It was not amended to do so until December 3, 1979. The bill received second reading in the Assembly on that same day, and passed that House on December 6, 1979. It came out of Senate Committee on December 10, 1979, and the Senate passed it on December 17, 1979. Given the history of judicial definition of prisoner's rights, the Legislature expected that these swiftly enacted procedures would be safeguarded by the judicial process and added the specific provision that "[a]ny such decision shall not be subject to judicial review except to the extent mandated by the New Jersey and United States Constitutions." *N.J.S.A.* 30:4–123.51(j).

The Legislature focused its concern on the core differences between the new and old processes of parole. Individual parole boards at each institution were replaced by professionally trained career parole system personnel. These new officials would administer a new act whose main substantive provision, tied to the Code's fixed minimum sentences, provided that once parole eligibility was received, parole would be granted unless there was a substantial probability of a repeat offense. *N.J.S.A.* 30:4–123.53(a). The perceived arbitrariness and unfairness of the prior parole system would yield to more objective standards.

The Legislature could not bring the eligibility dates of pre-Code inmates into line with the Code without recognizing that pre-Code sentences, unlike post-Code ones, did not reflect an

aspect of punitive parole ineligibility.[11] It chose to allow each prosecutor or sentencing judge to evaluate this issue. The procedural guidelines that we adopt will best achieve that purpose.

The Appellate Division correctly rejected the remaining challenges to the legislation on grounds of illegal delegation of powers and denial of equal protection. We affirm its judgments in those respects for the reasons stated in its opinion. 182 *N.J.Super.* 540.

In view of the dispositions that we make, we deny the defendants' motions for additional discovery of records relating to other prisoners similarly situated and to supplement the record with that information. The briefs in this case assert that in one county 97% of the prisoners were denied the full-step reduction, while in another 100% were refused this reduction.

## VI

In conclusion, we hold the basic framework of classification of multiple offenders for parole eligibility purposes under the Parole Act of 1979 to be constitutional. We hold that its procedures are deficient in not requiring a statement of reasons for the finding that the punitive aspects of the sentence have not been fulfilled, and in not affording prisoners the opportunity to comment upon the reasons stated. We construe the statute to include those procedures since we find that the Legislature would intend the system to survive as modified, and we remand the causes for further proceedings.

The judgments of the Appellate Division are affirmed in part and reversed in part.

---

[11]The Legislature's concern that pre-Code offenders might be released before they fulfilled the punitive aspects of their sentences was recognized by *Trantino,* which noted that the punitive aspects of a sentence may be relevant to that degree of rehabilitation that demonstrates that there is a substantial likelihood that the offender will not commit future crimes. 89 *N.J.* at 371.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.