706 A.2d 1096

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHRISTOPHER BRIMAGE, DEFENDANT–
APPELLANT.

Argued October 21, 1997—Decided February 19, 1998.

*Stephen A. Caruso*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney).

*Paul H. Heinzel*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

We are again presented with issues relating to Section 12 of the Comprehensive Drug Reform Act of 1987, *N.J.S.A.* 2C:35–1 to 36A–1 (hereinafter "CDRA"). Under *N.J.S.A.* 2C:35–12 ("Section 12"), a prosecutor may, through a negotiated plea agreement or post-conviction agreement with a defendant, waive the mandatory minimum sentence specified for any offense under the CDRA. To satisfy the constitutional requirements of the separation of powers doctrine, *N.J. Const.* art. III, ¶ 1, this Court in *State v. Vasquez* held that prosecutorial discretion under Section 12 must be subject to judicial review for arbitrary and capricious action. 129 *N.J.* 189, 195–96, 609 *A.*2d 29 (1992). To further that review, the Court held that prosecutors must adhere to written guidelines governing plea offers and state on the record their reasons for

waiving or not waiving the parole disqualifier in any given case. *Ibid.*

In response to that holding, the Attorney General promulgated plea agreement guidelines. *See Directive Implementing Guidelines Governing Plea–Bargaining and Discretionary Decisions in Drug Prosecutions Involving Mandatory Terms,* from Robert J. Del Tufo, Attorney General, to the Director, Division of Criminal Justice and All County Prosecutors (Sept. 15, 1992) (hereinafter "Guidelines" or "1992 Guidelines"). Those Guidelines were subsequently amended by the Attorney General's 1997 Supplemental Directive and then were again amended by the Uniformity Directive in 1998; however, the essential provisions of the Guidelines remain the same. *See Attorney General's Supplemental Directive For Prosecuting Cases Under the Comprehensive Drug Reform Act,* from Peter Verniero, Attorney General, to All County Prosecutors (January 6, 1997) (hereinafter "Supplemental Directive"); *Attorney General Directive To Enhance Uniformity in Sentencing Under the Comprehensive Drug Reform Act* (January 15, 1998) (hereinafter "Uniformity Directive"). Although the Guidelines prescribe statewide minimum plea offers, they also direct each county prosecutors office to adopt its own written plea agreement policy, which may include standard plea offers that are more stringent than the statewide minimums provided by the Attorney General. *Guidelines, supra,* §§ 3–4.

Defendant asserts, therefore, that the Guidelines have resulted in variant plea-bargaining policies among the counties. According to defendant, the Guidelines fail to channel prosecutorial discretion adequately under Section 12 and instead result in unjustifiable intercounty disparity in sentencing. More specifically, he argues that his sentence of four years with the presumptive statutory requirement of three years parole ineligibility should have been vacated because if he had committed the same offense in some other counties he would have received a lesser sentence.

We must determine whether the Attorney General's Plea-Bargaining Guidelines are adequate to satisfy the separation of

powers doctrine, as enunciated in *Vasquez, supra*, and to meet the statutory goals of uniformity in sentencing.

## I.

On May 12, 1995, the Franklin Township Police, armed with a search warrant, conducted a search of the Brimage residence. According to defendant's statements at the plea hearing, during the search defendant turned over to the police eighteen bags of cocaine totaling about six grams. The police arrested defendant and several other individuals who were present at the time. Defendant stated at the plea hearing that he had purchased the cocaine in New Brunswick and intended to resell it in Franklin Township. Defendant's residence was within 1000 feet of Franklin Township High School.

In September 1995, defendant was indicted under the CDRA for possession of a controlled dangerous substance with intent to distribute, contrary to *N.J.S.A.* 2C:35–5(a)(1), (b)(3); possession of a controlled dangerous substance with intent to distribute within 1000 feet of school property, contrary to *N.J.S.A.* 2C:35–7; and possession of a controlled dangerous substance, contrary to *N.J.S.A.* 2C:35–10(a)(1), all third degree offenses. Four other individuals, including at least two family members, were also charged in the last count.

According to the presentence report, defendant was twenty at the time of arrest and living in his grandparents' home with his grandparents, mother, and siblings. Defendant had not previously been arrested for an indictable offense, but he had three prior juvenile adjudications, the last when he was fourteen years old.

The Somerset County Prosecutor's Office offered, in exchange for defendant's guilty plea, to recommend the presumptive sentence for a third degree crime—four years incarceration—plus the mandatory three-year period of parole ineligibility specified in *N.J.S.A.* 2C:35–7 for the school zone offense. The prosecutor proffered the following reasons for not waiving the parole ineligibility term of *N.J.S.A.* 2C:35–7: the proofs available to sustain a conviction of defendant were very strong, including defendant's

taped confession that he intended to sell cocaine for profit; defendant did not offer to cooperate in any other drug-related investigations; and the Somerset County Prosecutor's Office had sufficient resources to litigate this matter, unlike various other counties that were plagued with a lack of resources or with case management problems.

Defendant moved for additional discovery from the State, requesting a copy of the applicable written guidelines governing plea offers for school zone offenses adopted by Somerset County. The State responded that the County, rather than promulgating its own guidelines, had adopted the Guidelines promulgated by the Attorney General. The State further asserted that that adoption satisfied the requirement that each county adopt a written plea agreement policy. In view of the State's response, the trial court declared defendant's application for discovery moot. Defendant then accepted the prosecutor's original plea agreement offer and pled guilty to all counts in the indictment, although he reserved the right to challenge the validity of the Guidelines and the applicability of the mandatory three-year parole disqualifier to his case. The court accepted defendant's guilty plea.

In March 1996, the court conducted a hearing on defendant's motion for waiver of the mandatory minimum sentence. Defendant argued that the standard plea offer required by the Attorney General's Guidelines for a school zone offense was the minimum offer stated therein—probation conditioned on 364 days in county jail—and that the prosecutor acted arbitrarily and capriciously by not making that offer to defendant. Defendant also maintained that the disparity in plea offers among the various counties based on the Guidelines was unjustifiable. The State, however, argued that the standard plea offer under the Guidelines included the statutory mandatory period of parole ineligibility and that statewide uniformity in such matters was not required. Finding that nonwaiver of the mandatory parole disqualifier was standard policy in Somerset County for school zone cases and that the Guidelines' lesser plea offer was only applicable when the prosecu-

tor in his discretion decided to waive that disqualifier, the court denied defendant's motion.

In the same proceeding, the court held a sentencing hearing. Observing that defendant had been adjudicated a delinquent on three separate occasions, that he had previously been on probation, and that he was still committing crimes, the court found four aggravating factors against defendant: the risk of committing another offense, N.J.S.A. 2C:44–1(a)(3); defendant's prior criminal record as a juvenile, N.J.S.A. 2C:44–1(a)(6); the need to deter defendant and other drug dealers, N.J.S.A. 2C:44–1(a)(9); and imposition of a fine or penalty without a prison term would be seen as just another cost of doing business, N.J.S.A. 2C:44–1(a)(11). The court found only one mitigating factor, the negative influence of older family members on defendant, N.J.S.A. 2C:44–1(b)(13). After merging counts one and three into count two, the court sentenced defendant to four years imprisonment with three years of parole ineligibility, in accordance with the prosecutors recommendation. The court also imposed the requisite fines and a six-month driver's license suspension.

Defendant filed a notice of appeal to the Appellate Division, which was heard by an excessive sentencing panel. In a brief, three-sentence order, the Panel affirmed defendants sentence, finding that on the record the sentence was not manifestly excessive, unduly punitive, nor an abuse of discretion. The panel, however, declined to address the disparity issue within the confines of a single case. We granted defendant's petition for certification. 149 N.J. 33, 692 A.2d 47 (1997).

## II.

We begin our analysis by reviewing the applicable CDRA statutes, the background behind the creation of the Attorney General's Guidelines (namely, the challenges to the statute on separation of powers grounds), the current status of the Guidelines and their resulting intercounty disparity, and finally, the statutory goals of uniformity in sentencing.

A.

*N.J.S.A.* 2C:35–7 of the Comprehensive Drug Reform Act ("Section 7") requires a mandatory minimum custodial sentence between one-third and one-half of the sentence imposed, but no less than three years for those convicted of dispensing or possessing with the intent to distribute drugs within a school zone, and no less than one year for those convicted of the same offense with less than one ounce of marijuana. Upon signing this legislation, Governor Thomas H. Kean emphasized the strong posture of the statute, stating: "This is a declaration of war and, in this war, we will take prisoners." *Office of the Governor, News Release* (April 15, 1987). That firm stance comports with the Legislature's intention, as stated in its Declaration of Policy and Legislative Findings for the CDRA, to "provide for the strict punishment, deterrence and incapacitation of the most culpable and dangerous drug offenders." *N.J.S.A.* 2C:35–1.1(c); *accord State v. Shaw*, 131 *N.J.* 1, 8, 618 *A.*2d 294 (1993); *Vasquez, supra*, 129 *N.J.* at 197, 609 *A.*2d 29. To foster that policy, the Legislature included in the CDRA mandatory periods of parole ineligibility for various crimes. *See, e.g., N.J.S.A.* 2C:35–3 (providing twenty-five year parole bar for leaders of narcotics trafficking network); *N.J.S.A.* 2C:35–6 (ordering minimum five-year parole bar for person convicted of employing juveniles in drug distribution scheme); *N.J.S.A.* 2C:35–7 (including strict parole bar for school zone offenses).

Despite the nondiscretionary nature of *N.J.S.A.* 2C:35–7, that section, like other mandatory parole bar provisions in the CDRA, contemplates exceptions to its rule as provided by *N.J.S.A.* 2C:35–12 ("Section 12"). Section 12 allows a prosecutor to waive the period of parole ineligibility imposed under Section 7 as part of a plea or post-conviction agreement with a defendant. Because mandatory sentences usually do not permit judicial or prosecutorial discretion, the unique Section 7 and Section 12 sentencing scheme has been characterized as "a hybrid, combining mandatory and discretionary features and delegating sentencing authority to

both the courts and the prosecutors." *Vasquez, supra,* 129 *N.J.* at 199, 609 *A.*2d 29.

The primary purpose of the Section 12 waiver provision is to provide an incentive for defendants, especially lower and middle level drug offenders, to cooperate with law enforcement agencies in the war against drugs. *State v. Bridges,* 131 *N.J.* 402, 408–09, 621 *A.*2d 1 (1993); *Vasquez, supra,* 129 *N.J.* at 204, 609 *A.*2d 29; Assembly Judiciary Committee, *Commentary to the Comprehensive Drug Reform Act,* at 26 (Nov. 23, 1987) (explaining that "[o]ne of the key objectives of this section and the act is to provide persons engaged in illicit drug activities with strong incentives to cooperate with law enforcement to overcome the perceived and substantial risks associated with turning State's evidence and exposing their superiors, suppliers and affiliates"). Another goal of *N.J.S.A.* 2C:35–12, as enunciated in the Department of Law and Public Safety's report on the CDRA, is to encourage plea bargaining so as not to plague the courts with too many defendants who, without any incentive to plead guilty, demand jury trials and thus overburden and backlog the system. Department of Law and Public Safety, Division of Criminal Justice, *A Law Enforcement Response to Certain Criticisms of the Comprehensive Drug Reform Act,* at 22–23, 25–26 (Sept. 17, 1990). That view of Section 12 is consistent with one of the Legislature's stated goals in enacting the CDRA, namely, the minimization of pretrial delay and the prompt disposition of criminal charges. *N.J.S.A.* 2C:35–1.1.

To achieve the Legislature's specific goal of encouraging cooperation and turning State's evidence and to prevent sentencing courts from undermining the effectiveness of prosecutors' strategies, *N.J.S.A.* 2C:35–12 requires the sentencing court to enforce all agreements reached by the prosecutor and a defendant under that section and prohibits the court from imposing a lesser term of imprisonment than that specified in the agreement. *N.J.S.A.* 2C:35–12; *Bridges, supra,* 131 *N.J.* at 410, 621 *A.*2d 1; *State v. Stewart,* 136 *N.J.* 174, 182, 642 *A.*2d 942 (1994). That shift in

sentencing power from the judiciary to the prosecutor is uncommon. As stated by the Court in *Vasquez, supra:*

> The delegation of sentencing power to the prosecutor is itself exceptional. The delegation of sentencing power to modify statutory sentencing standards is highly unusual. The power in the prosecutor directly or indirectly to *mandate* a minimum prison term is extraordinary.
>
> [129 *N.J.* at 204, 609 *A.*2d 29 (citations omitted).]

## B.

As a result of the atypical grant of sentencing power to the prosecutor in *N.J.S.A.* 2C:35-12, that statute has been the subject of various constitutional challenges on separation of powers grounds. *See, e.g., State v. Gerns,* 145 *N.J.* 216, 231–32, 678 *A.*2d 634 (1996); *Vasquez, supra,* 129 *N.J.* at 195–96, 609 *A.*2d 29; *State v. Peters,* 129 *N.J.* 210, 218, 609 *A.*2d 40 (1992).

We first considered the interaction of Section 7 and Section 12 in the companion cases of *Vasquez, supra,* 129 *N.J.* 189, 609 *A.*2d 29, and *Peters, supra,* 129 *N.J.* 210, 609 *A.*2d 40. In *Vasquez, supra,* although ultimately ruling on the applicability of the mandatory parole ineligibility term to resentencing, this Court addressed for the first time the constitutional validity of Section 12. 129 *N.J.* at 192, 195, 609 *A.*2d 29. In that case, we upheld the transfer of sentencing authority under Section 12, but stated that judicial oversight was "mandated to protect against arbitrary and capricious prosecutorial decisions." *Id.* at 196, 609 *A.*2d 29. To enable judicial review, we required prosecutors to state on the record their reasons for waiving or not waiving the parole disqualifier in any given case and to promulgate written guidelines governing their exercise of discretion. *Id.* at 195–96, 609 *A.*2d 29. The Court held that, if those conditions were met, the statute would withstand scrutiny under the separation of powers doctrine, and only those defendants who showed "clearly and convincingly that the exercise of discretion was arbitrary and capricious would be entitled to relief." *Vasquez, supra,* 129 *N.J.* at 196, 609 *A.*2d 29. We maintained those same requirements in *Peters, supra,* 129 *N.J.* at 218, 609 *A.*2d 40.

In reaching our decision in *Vasquez, supra,* 129 *N.J.* at 195, 609 *A.*2d 29, we relied on our previous decision in *State v. Lagares,* 127 *N.J.* 20, 601 *A.*2d 698 (1992). *Lagares, supra,* involved the constitutionality of the prosecutor's power to invoke the extended sentence requirement under *N.J.S.A.* 2C:43–6(f). 127 *N.J.* at 23, 601 *A.*2d 698. Although *N.J.S.A.* 2C:43–6(f) requires a court to impose an extended term with a period of parole ineligibility for repeat drug offenders, the provision only takes effect upon the application of the prosecutor. *Ibid.* Furthermore, once the prosecutor decides to apply for an extended sentence, the sentencing judge has no discretion to reject the application. *Id.* at 31, 601 *A.*2d 698. According to the Court, the "infirmity in Section 6f is the prosecutor's sole discretion to select, without standards and without being subject to the court's review, which defendants will receive an increased sentence or enjoy favorable treatment." *Id.* at 28, 601 *A.*2d 698. Therefore, to pass constitutional scrutiny, the Court required that prosecutorial decisions under Section 6f be subject to judicial review for arbitrariness, that prosecutors state on the record their reasons for seeking an extended sentence, and that "guidelines be adopted to assist prosecutorial decision-making." *Id.* at 28–32, 601 *A.*2d 698; *Vasquez, supra,* 129 *N.J.* at 195, 609 *A.*2d 29.

*Lagares* based that decision, in turn, on previous decisions of this Court in *State v. Warren,* 115 *N.J.* 433, 558 *A.*2d 1312 (1989), *State v. Leonardis,* 73 *N.J.* 360, 375 *A.*2d 607 (1977) (*Leonardis II* ), *State v. Leonardis,* 71 *N.J.* 85, 363 *A.*2d 321 (1976) (*Leonardis I* ), and *Monks v. New Jersey State Parole Board,* 58 *N.J.* 238, 277 *A.*2d 193 (1971). 127 *N.J.* at 28–31, 601 *A.*2d 698. We held in *Leonardis I, supra,* that prosecutorial discretion in dismissing charges against certain defendants and admitting them into pretrial intervention (PTI) programs must be subject to uniform written guidelines and judicial review of the prosecutor's written statement of reasons. 71 *N.J.* at 119, 121, 363 *A.*2d 321; *Lagares, supra,* 127 *N.J.* at 28–29, 601 *A.*2d 698. Similarly, we held in *Monks, supra,* that the parole board had to provide a statement of reasons to inmates who had been denied parole in order to meet

the needs of simple fairness. 58 *N.J.* at 246, 277 *A.*2d 193; *Lagares, supra,* 127 *N.J.* at 29–30, 601 *A.*2d 698. This Court stated in *Leonardis II, supra,* that although deference should be given to prosecutor's determinations, "the prosecutor is not immune from the ban against arbitrariness in governmental decision-making." 73 *N.J.* at 377, 381, 375 *A.*2d 607; *Lagares, supra,* 127 *N.J.* at 29, 601 *A.*2d 698. Furthermore, in *Warren, supra,* we prohibited the use of "negotiated sentence" plea agreements because of the importance of judicial responsibility in sentencing. 115 *N.J.* at 449, 558 *A.*2d 1312; *Lagares, supra,* 127 *N.J.* at 30, 601 *A.*2d 698.

Underlying the Court's decisions in the guidelines cases was also a concern for uniformity in sentencing. The *Leonardis I* Court identified the disparity allowed between counties as one of two major deficiencies of *Rule* 3:28, the rule governing PTI, and suggested that that disparity had constitutional implications. *Leonardis I, supra,* 71 *N.J.* at 120–21, 363 *A.*2d 321. The *Lagares* Court emphasized the statutory basis for the goal of uniformity in sentencing, finding it to be the overarching purpose of the Code of Criminal Justice. 127 *N.J.* at 31, 601 *A.*2d 698. The Court concluded: "Without standards the prosecutorial decision-making process remains unguided, and the danger of uneven application of enhanced sentences increases significantly. Such results upset the principal goal of the Code of Criminal Justice to insure sentencing uniformity." *Ibid.* (citing *State v. Roth,* 95 *N.J.* 334, 365, 471 *A.*2d 370 (1984)). In *Warren, supra,* we stressed that prosecutorial influence on the judicial role could impede the goals of sentencing uniformity. 115 *N.J.* at 449, 558 *A.*2d 1312. We stated that "[i]ndividual prosecutors with distinctive perceptions of the gravity of particular offenses and offenders, and responsive to a very different constituency from that of the judiciary, would add undue variability, inevitable inconsistency, and greater disparity to the sentencing process." *Ibid.* Finally, in *Vasquez, supra,* we affirmed the importance of uniformity in the plea agreement process. 129 *N.J.* at 196, 609 *A.*2d 29. We stated that the promulgation of standards would "prevent the legislative goal of

uniformity in sentencing from being undermined by unreviewable prosecutorial discretion." *Ibid.*

In summary, the *Vasquez/Lagares* line of cases held that judicial review of prosecutorial decisions through uniform written guidelines was necessary not only to meet the requirements of the separation of powers doctrine, but also to comport with the statutory goal of increasing uniformity in sentencing.

## C.

### *The Guidelines*

In response to this Courts ruling in *Vasquez, supra,* on September 15, 1992 the Attorney General promulgated plea agreement guidelines for charges brought under the Comprehensive Drug Reform Act.[1] Those original 1992 Guidelines governed at the time of defendant's plea.

Recognizing the various goals of the Legislature in enacting the CDRA as well as the intentions of the Court in *Vasquez, supra,* the Introduction to the 1992 Guidelines states:

> In order to satisfy the principal goal of the Legislature to ensure a *uniform, consistent and predictable sentence* for a given offense, these decisions require that the prosecutorial decision-making process must *be guided by uniform standards that channel the exercise of discretion and reduce the danger of uneven application.* The formulation of *uniform standards* is required by Directive 9.1 of the Attorney General's *Statewide Action Plan for Narcotics Enforcement* (1988), which called for development of statewide guidelines governing prosecutorial charging discretion and plea negotiations.
>
> [*Guidelines, supra,* § I (citations omitted) (emphasis added).]

The Introduction also emphasizes that the purpose of Section 12 is to provide incentives to defendants to cooperate with the State

---

[1] In response to *Lagares,* the Attorney General also issued Guidelines governing the exercise of prosecutorial discretion under *N.J.S.A.* 2C:43-6(f). *See Directive Implementing Guidelines for Determining Whether to Apply For an Extended Term Pursuant to N.J.S.A. 2C:43-6(f),* from Robert J. Del Tufo, Attorney General, to Director, Division of Criminal Justice and All County Prosecutors (Apr. 20, 1992).

and recognizes that "swiftness" of punishment is also an important goal. *Ibid.*

The Guidelines continue by asserting that the "specified mandatory term of imprisonment and minimum term of parole ineligibility" should be treated as norms and that prosecutors "should exercise caution and reluctance in deciding whether to waive the minimum sentence or parole ineligibility." *Id.* § II.1. More specifically, in Section II.3 of those Guidelines, the Attorney General requires that all plea agreements for a CDRA offense impose on defendants a mandatory minimum term of incarceration, except where the agreement is or was necessary to obtain cooperation of "substantial value" to the State. *Id.* § II.3. That term must be a state prison term, except in the case of a school zone offense under *N.J.S.A.* 2C:35-7. *Ibid.* The 1992 version of the Guidelines provides that the "minimum term of imprisonment for a school zone offense shall include the imposition of 364 days incarceration in a county jail as a condition of probation," unless the violation involves distributing, dispensing, or possessing with intent to distribute less than one ounce of marijuana in a school zone, in which case the prison term may be waived entirely. *Ibid.* The 1992 Guidelines are also specific in their mandate of a three-year term of imprisonment without eligibility for parole for defendants who distribute, or possess with intent to distribute, a controlled dangerous substance while actually on school property, or one year in a case involving less than one ounce of marijuana, unless there are compelling reasons to justify a lesser term. *Id.* § II.6. In Section II.9, the Guidelines specify various requirements for cooperation agreements. *Id.* § II.7, 9. Finally, in Section II.5, the Guidelines outline criteria for deciding whether to approve or disapprove a plea agreement that incorporates an upward or downward departure from any plea agreement policy. *Id.* § II.5.

Despite those specific provisions in the Guidelines, Section II.4 directs each county prosecutor's office to adopt and implement its own written policy governing plea and post-conviction agreements,

using the Guidelines as a model, and suggests that the counties may also promulgate their own "standardized plea offers for typical cases and offenders." *Id.* § II.4. The Guidelines state that the counties, in formulating those plea offers, may consider certain factors such as the nature and extent of the drug distribution and use problem, the number and type of drug arrests in the jurisdiction, and the backlog of drug and non-drug cases in the courts. *Ibid.* They should also consider the seriousness of the offense, the role of the actor in the crime, the amount of time that has passed since the offense was committed, whether the defendant has previously been convicted of an offense, and the amount of resources already expended on the particular case. *Ibid.* Finally, Section II.4 specifically states that "[n]othing contained in these guidelines shall preclude a prosecutor from adopting more stringent policies or standardized plea offers consistent with the needs, resources and enforcement priorities of each county." *Ibid.* Thus, by its very language, Section II.4 of the Guidelines permits different counties to adopt disparate and varying plea offer policies. Not only does consideration of the numerous factors listed in Section II.4 assure different results in localities with differing conditions, but the Guidelines themselves direct each county to adopt their own individual standards and procedures.

Although the Introduction to the Guidelines recognizes the need to "guard against sentencing disparity," the Guidelines actually generated such disparity. *Id.* § I. The intercounty disparity created by the Guidelines is evidenced in the actual policies that have been adopted throughout the jurisdictions. The affidavit of Robert A. Gaynor, an Assistant Deputy Public Defender in Somerset County, estimated, as of March 1996, the plea offers that a person in defendant's situation would have received in different counties, based on each county's plea policies as they existed at that time. Although the standard plea offer in Gloucester and Hudson Counties would have been probation with 364 days in jail, the pre-indictment offer in Mercer and Salem Counties was one year without parole. Meanwhile, the plea in Camden and Cumberland Counties would have been three years flat and three to

five years flat, respectively. Even the counties that purported, at that time, to have adopted the Attorney General's Guidelines without modification differed in their potential offers. Ocean and Bergen Counties provided in 1996 for probation conditioned on 364 days in jail; Sussex in 1996 required three years imprisonment, one without parole; and Somerset, the county in this case, provided four years, three without parole.

### The Supplemental Directive

Subsequent to Brimage's plea, the Attorney General issued additional guidelines in its 1997 Supplemental Directive; however, the Supplemental Directive fails to limit the discretion authorized by Section II.4 and thus maintains the resulting intercounty disparity. The Supplemental Directive was developed in response to Governor Christine Todd Whitman's Drug Enforcement, Education and Awareness Program, which required the Attorney General to issue new, revised guidelines concerning prosecutorial charging, case disposition, and plea bargaining policies to ensure that the CDRA is aggressively and uniformly enforced in court. *Governor's Drug Enforcement, Education and Awareness Program*, at iv (Oct. 8, 1996). The Supplemental Directive mandates, among other requirements, that each county reduce its plea policies to writing and review the policies at least once a year; that downward departures shall not be permitted except as provided in the Attorney General's Guidelines; that both downward and upward departures and all cooperation agreements shall be memorialized in writing; that the prosecutor shall seek imposition of the appropriate Drug Enforcement and Demand Reduction penalties and driver's license suspensions pursuant to *N.J.S.A.* 2C:35–15 to –16; and that offenders may be sentenced to treatment in lieu of imprisonment only if they meet a long list of explicit conditions. *Supplemental Directive, supra,* § III.1–4, 6(a)–(b), 9(a). However, the Supplemental Directive declares that the previous Guidelines, except as expressly provided, are "hereby reaffirmed," and "shall remain in full force and effect." *Id.* § II. Thus, while the Directive states that the Guidelines are "intended

and shall hereinafter be interpreted to establish drug prosecution policies that must be followed by every county prosecutor's office," the Directive nevertheless permits each county to adopt its own standards pursuant to Section II.4. *Id.* § II.

Just as occurred under the 1992 Guidelines, the discretion allowed by the Supplemental Directive also led to actual disparity in the plea offer policies adopted by various counties. As of May 1997, for school zone cases where the offense did not occurr on school property, some counties provided a list of standard plea offers based on the nature of defendants criminal history and the amount or nature of drugs involved in the crime (Mercer and Middlesex Counties); another established two standard plea offers, one for all cases involving less than one ounce of marijuana and one for all other cases (Morris County); and still others adopted policies reiterating the language in Section II.3 of the Attorney General's 1992 Guidelines, which states that the minimum term of imprisonment shall be probation conditioned on 364 days in county jail (Ocean and Atlantic Counties).

### The Uniformity Directive

On January 15, 1998, the Attorney General issued its most recent amendments to the plea agreement Guidelines. Those amendments resulted from this Court's mandate in *State v. Gerns,* 145 *N.J.* 216, 678 *A.*2d 634 (1996).

In *Gerns, supra,* this Court heard arguments on the issue of impermissible sentencing disparities under the Attorney General's Guidelines. *Id.* at 231, 678 *A.*2d 634. Although specifically addressing the question of whether a defendant who signs a plea agreement calling for "cooperation" in state investigations can satisfy that agreement by good faith efforts that produce nothing of value to the State, the Court noted the significance of the defendant's disparity claims:

> [T]he arguments and the statistical data proffered in support of the claim of sentencing disparity are impressive.... [T]he indicia of grave sentencing disparities are sufficient to engender a concern over the potential for sentencing disparity.

That concern must be addressed in light of the Code's overriding commitment to assuring uniformity in criminal sentencing....

[*Id.* at 231, 678 A.2d 634.]

Furthermore, in remanding on the primary issue in the case and in anticipation of the defendant's resentencing, the Court urged the prosecutor and the trial court "in the exercise of their respective discretion to be especially mindful of the problem that is posed by the potential of disparity." *Id.* at 232, 678 *A.*2d 634. However, the Court chose not to resolve the disparity issue in the context of that case and instead directed the Attorney General to undertake a review of statewide sentencing practices and experience under the Guidelines and to furnish the Court with the results of that review. *Id.* at 232, 678 *A.*2d 634. The Attorney General promulgated the Uniformity Directive in response to that command. *Uniformity Directive, supra,* § I.

The Uniformity Directive acknowledges that sentencing disparity is reflected in the "range of sentences contemplated by standardized plea offers that have been promulgated by the twenty-one county prosecutors." *Ibid.* The Directive also recognizes that, in some counties, defendants charged with a third-degree school zone offense are routinely sentenced to an eighteen-month period of parole ineligibility, while in other counties, similarly situated individuals receive 364 days in county jail as a condition of probation. *Ibid.* Furthermore, when parole laws and early release practices are taken into account, that latter sentence may be reduced to as little as ninety days of incarceration, which some counties even allow defendants to serve solely on nights or weekends. *Ibid.*

The Uniformity Directive notes that parole laws account for much of the disparity highlighted in *Gerns, supra.* However, the Directive also argues that, because of differences in resources and in the nature of the drug problem in different counties, it is "neither possible nor desirable to achieve absolute statewide uniformity in plea negotiation practices." *Ibid.* As a result, the Uniformity Directive, unanimously approved by the County Prosecutors' Association, seeks to "restrict the range of permissible

sentencing outcomes," but only by establishing a new base minimum plea offer. *Ibid.*

The Directive provides that Section II.3 of the 1992 Guidelines is superseded to the extent that it conflicts with Section III of the current Directive. *Id.* § II. Whereas Section II.3 states that the minimum period of parole ineligibility for a school zone offense shall be probation conditioned on 364 days in jail, the new Section III requires that the minimum parole ineligibility term for an offense under *N.J.S.A.* 2C:35–7 shall be one year. *Id.* § III. Similarly, for violations involving less than one ounce of marijuana, Section II.3 of the 1992 Guidelines provides that a prison term may be waived entirely, while Section III of the Uniformity Directive states that the standardized plea offer may not be less than 364 days of incarceration as a condition of probation. *Ibid.*

Although the Uniformity Directive succeeds in raising the base minimum plea offer for a school zone offense, the Directive does no more to promote uniformity in plea agreement policies. Section III clearly states: "Nothing in this Directive shall be construed to preclude a county prosecutor from establishing and implementing a plea policy that provides standardized offers ... with a period of parole ineligibility greater than one year." *Id.* § III. Furthermore, the Directive maintains that "[e]xcept as expressly provided, ... all of the provisions of the previously-issued Attorney General plea directives ... shall remain in full force and effect." *Id.* § IV. Therefore, despite the Directive's attempts to address disparity, Section II.4 of the 1992 Guidelines remains in effect and the Directive continues to allow for varying plea policies among the counties.

## D.

In the *Vasquez/Lagares* line of cases, we noted that disparate sentencing fails to comport with the Legislature's intent, in enacting the Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to 98–4 and the CDRA, that there be uniformity in sentencing.

Sentencing uniformity is one of the fundamental goals of the Code of Criminal Justice ("Code"). The Legislature lists among the purposes of the sentencing provisions of the Code the intent to "safeguard offenders against excessive, disproportionate or arbitrary punishment," and to "give fair warning of the nature of the sentences that may be imposed on conviction of an offense." *N.J.S.A.* 2C:1–2. *State v. Roth*, the first case to address in detail the standards that guide sentencing under the Code, stated, "[i]t is our view that the Code established an entirely new sentencing process. It displaced standards established under prior decisional law, created presumptive terms of imprisonment, and limited the discretionary power of sentencing courts." 95 *N.J.* 334, 340, 471 *A.*2d 370 (1984). The Court continued, "[t]he central theme of the Code's sentencing reforms is the replacement of the unfettered sentencing discretion of prior law with a structured discretion designed to foster less arbitrary and more equal sentences." *Id.* at 345, 471 *A.*2d 370. The Court emphasized that the "paramount goal of sentencing reform was greater uniformity." *Id.* at 369, 471 *A.*2d 370.

In *State v. Hodge*, the Court repeated these sentiments. 95 *N.J.* 369, 471 *A.*2d 389 (1984). The Court in that case stated that "there can be no justice without a predictable degree of uniformity in sentencing. We must not forget that the driving force behind sentence reform was the tragic disparity in sentences inflicted upon defendants under the old model." *Hodge, supra*, 95 *N.J.* at 379, 471 *A.*2d 389. Governor Brendan Byrne, upon signing the new law, also commented, "[t]he Criminal Code is intended to make sentencing more definitive. . . . It is designed to reduce the possibility of one judge giving a stiff sentence and another a light sentence for similar crimes." *Roth, supra*, 95 *N.J.* at 354, 471 *A.*2d 370 (citing *Statement of Gov. Byrne* (Aug. 10, 1978)).

To meet those goals, the Code offers specific sentencing instruction to judges, including detailed guidelines and rules. In particular, the Code provides for a range of permissible sentences for each degree of crime, *N.J.S.A.* 2C:43–6(a); certain mandatory

minimum punishments, such as under the Graves Act, *N.J.S.A.* 2C:43–6(c); the imposition of a mandatory extended term of imprisonment for certain crimes within specified permissible ranges, *N.J.S.A.* 2C:43–7(a); a presumption of imprisonment for all first and second degree offenses, *N.J.S.A.* 2C:44–1(d); a list of specific aggravating and mitigating factors to be considered in sentencing, *N.J.S.A.* 2C:44–1(a),(b); a list of authorized sentencing dispositions, *N.J.S.A.* 2C:43–2; and a list of the grounds upon which a defendant must be sentenced to a mandatory extended term, *N.J.S.A.* 2C:44–3. While the Code still affords discretion to individual judges in deciding among different factors and choosing a sentence within a permissible range, that discretion is guided by specific standards which apply on a uniform, statewide basis.

Consistent with this statutory scheme, this Court has repeatedly "acknowledged the dominance, if not paramountcy, of uniformity as one of the Code's premier sentencing goals." *State v. Pillot,* 115 *N.J.* 558, 571–72, 560 *A.*2d 634 (1989) (citing *State v. Jarbath,* 114 *N.J.* 394, 400, 555 *A.*2d 559 (1989); *Hodge, supra,* 95 *N.J.* at 379, 471 *A.*2d 389; *State v. Hartye,* 105 *N.J.* 411, 417, 522 *A.*2d 418 (1987)); *see also State v. Roach,* 146 *N.J.* 208, 231–32, 680 *A.*2d 634, *cert. denied,* —— U.S. ——, 117 *S.Ct.* 540, 136 *L.Ed.*2d 424 (1996) (invalidating defendant's sentence where a co-defendant charged with the same or similar crime received slightly less onerous terms); *State v. Hicks,* 54 *N.J.* 390, 255 *A.*2d 264 (1969) (same).

The goals of sentencing uniformity are also evident in the CDRA. In the Declaration of Policy for the CDRA, the Legislature recognized the need for "fair and certain punishment" and that the imposition of a "uniform, consistent and predictable sentence for a given offense is an essential prerequisite to any rational deterrent scheme." *N.J.S.A.* 2C:35–1.1(a), (c). To guard against sentencing disparity, the Legislature, in enacting the CDRA, had made "sweeping revisions" to the predecessor law contained in the Controlled Dangerous Substances Act, *N.J.S.A.* 24:21–1 to –53. *Bridges, supra,* 131 *N.J.* at 407, 621 *A.*2d 1; *see also* Department of Law and Public Safety, Division of Criminal

Justice, *A Law Enforcement Response to Certain Criticisms of the Comprehensive Drug Reform Act,* at 12 (Sept. 17, 1990) ("The act itself was an explicit legislative response to sentencing practices under the predecessor drug law."). Historically, vast sentencing discretion in the State's drug laws "[had] fostered unjustified differences in the way similarly situated defendants [were] treated." Governor Thomas H. Kean, *Blueprint For a Drug-Free New Jersey,* at 24 (Oct.1986). Therefore, the Legislature believed that the CDRA's consolidation of drug offenses and provisions into the penal code, which established degrees of crimes and definitive sentencing ranges and presumptive terms for each degree, would "limit courts' sentencing discretion, and [would] ensure more uniform, consistent and predictable sentencing practices." *Bridges, supra,* 131 *N.J.* at 408, 621 *A.*2d 1 (citing Assembly Judiciary Committee, *Statement to Assembly Bill No. 3270* (Dec. 18, 1986)). The mandatory minimums and presumptive terms that exist throughout the CDRA, and in particular in *N.J.S.A.* 2C:35–7 for school zone offenses, were a result of that reform.

## III.

### A.

By permitting each county to adopt its own standard plea offers and policies, neither the former nor the current Guidelines serve as the universal, equitable prototype that the *Vasquez* line of cases had in mind. Although the guidelines adopted within each county may avoid arbitrariness with respect to decision-making among individual prosecutors, and while we concede that "some disparity in sentencing is inevitable in the administration of criminal justice," *Roach, supra,* 146 *N.J.* at 234, 680 *A.*2d 634, the formalization of disparity from county to county is clearly impermissible. *See State v. Press,* 278 *N.J.Super.* 589, 603, 651 *A.*2d 1068 (App.Div.) (Stern, J., dissenting), *certif. denied,* 140 *N.J.* 329, 658 *A.*2d 729 (1995), *appeal dismissed,* 144 *N.J.* 373, 676 *A.*2d 1089 (1996). The intercounty disparity authorized by the Attorney General's Guidelines, both before and after their amendment, violates the goals of uniformity in sentencing and, thus, not only

fails on statutory grounds, but also threatens the balance between prosecutorial and judicial discretion that is required under *Vasquez, supra,* 129 *N.J.* 189, 609 *A.*2d 29. The Guidelines fail to appropriately channel prosecutorial discretion, thus leading to arbitrary and unreviewable differences between different localities. As stated by the dissent in *Press, supra,* the "premise on which the constitutionality of the sentencing scheme is based falls when the scheme itself promotes or formalizes the potential arbitrariness by permitting deviation from county to county." *Press, supra,* 278 *N.J.Super.* at 603, 651 *A.*2d 1068 (Stern, J., dissenting).

Accordingly, to meet the requirements of the *Vasquez* line of cases, the plea agreement guidelines for *N.J.S.A.* 2C:35–12 must be consistent throughout the State. To "promote uniformity and provide a means for prosecutors to avoid arbitrary or abusive exercises of discretionary power" under the extended sentencing provisions of *N.J.S.A.* 2C:43–6(f), the Court in *Lagares, supra,* ordered the Attorney General to adopt guidelines "for use throughout the state." 127 *N.J.* at 32, 601 *A.*2d 698. In *Leonardis I, supra,* we stated that the future utility of PTI was "dependent upon its uniform implementation on a statewide basis" and we rejected the exclusionary criteria adopted by one particular county. 71 *N.J.* at 112, 363 *A.*2d 321. Similarly, in *Town Tobacconist v. Kimmelman,* we held that the constitutionality of the Drug Paraphernalia Act was strengthened because of the specific, uniform, statewide guidelines that had been issued by the Attorney General. 94 *N.J.* 85, 462 *A.*2d 573 (1993). The same statewide application of the Attorney General's Guidelines is required here. Just as with the sentencing guidelines under the Code, which guide judicial sentencing discretion on a statewide basis, prosecutors must be guided by specific, universal standards in their waiver of mandatory minimum sentences under the CDRA.

### B.

Although the record does not indicate that the availability of county resources has been a significant factor in causing

sentencing disparity between the counties, we recognize, as did the majority in *Press, supra,* the need for some flexibility among the different counties and some accommodation of local concerns and differences. 278 *N.J.Super.* at 593–94, 651 *A.*2d 1068. The Declaration of Policy for the CDRA states that one of the goals of the Act is to "ensure the most efficient and effective dedication of limited investigative, prosecutorial, judicial and correctional resources," *N.J.S.A.* 2C:35–1.1, and in *Shaw, supra,* we acknowledged that using the waiver power to advance this legislative goal "would not be an abuse of power." 131 *N.J.* at 11, 618 *A.*2d 294. Consistent with that authority, we believe that differences in available county resources as well as varying backlog and caseload situations are legitimate factors that prosecutors may consider in deciding whether or not to waive a mandatory minimum sentence under *N.J.S.A.* 2C:35–12. *See Uniformity Directive, supra,* § I ("County prosecutors ... must have some discretion in setting enforcement priorities and prosecution policies to reflect local concerns and enforcement opportunities."). However, before a prosecutor may take any such factors into account, those factors must be explicitly set forth in and authorized by the Attorney General's Guidelines, just as the requirements for cooperation agreements are precisely and distinctly enumerated. Although we agree with the *Press* majority and the Attorney General's Uniformity Directive that flexibility among the prosecutors of different counties may sometimes be necessary, that does not justify the adoption of different guidelines in every county in contravention of the goals of uniformity and the *Vasquez* line of cases. Any flexibility on the basis of resources or local differences must be provided for and explicitly detailed within uniform, statewide guidelines.

C.

We therefore order the Attorney General to review and promulgate, within ninety days, new plea offer guidelines, which all

counties must follow. Although the Attorney General may choose to continue certain specific provisions of the old Guidelines or may choose to adopt entirely new guidelines, including new minimum and standard sentences, he must eliminate those provisions which specifically encourage intercounty disparity. The new guidelines should specify permissible ranges of plea offers for particular crimes and should be more explicit regarding permissible bases for upward and downward departures. The Attorney General may, if he chooses, provide for differences in treatment among various offenders based on specific factors of flexibility among the counties, such as resources or backlog, in certain circumstances. As in all plea offers, the individual characteristics of the crime and of the defendant, such as whether the defendant is a first or second time offender, must be considered. Finally, to permit effective judicial review, prosecutors must state on the record their reasons for choosing to waive or not to waive the mandatory minimum period of parole ineligibility specified in the statute. Additionally, for proper judicial review, if a prosecutor departs from the guidelines, the reasons for such departure must be clearly stated on the record.

The guidelines as amended will not only satisfy statutory and separation of powers concerns, but will also meet rational basis requirements for any equal protection challenge. *See Leonardis I, supra,* 71 *N.J.* at 120–21, 363 *A.*2d 321; *Lagares, supra,* 127 *N.J.* at 33, 601 *A.*2d 698. Not only is there a clear rational basis for mandating uniform guidelines, as evidenced by the wealth of authority on this point, but there is also a rational basis for permitting a certain degree of flexibility within those guidelines, based on the differing resources and needs of the various counties, provided those factors are explicitly detailed by the Attorney General.

## IV.

Finally, we hold that our ruling today is prospective, except with respect to this case and all cases on direct appeal.

Although retrospectivity is the traditional rule, sound policy reasons may persuade a court to accord a judicial decision prospective application. *Coons v. American Honda Motor Co.,* 96 *N.J.* 419, 425, 476 *A.*2d 763 (1984). Those reasons are: (1) justifiable reliance by the parties and the community as a whole on prior decisions, (2) a determination that the purpose of the new rule will not be advanced by retroactive application, and (3) a potentially adverse effect retrospectivity may have on the administration of justice. *Id.* at 426, 476 *A.*2d 763. How the Court applies those factors depends on the Court's view of what is just and fair and consonant with public policy. *Id.* at 425, 476 *A.*2d 763.

In this case, the first and third factors are the most significant. Application of those components mandates that today's ruling be applied prospectively. The State, the counties, and numerous defendants have relied on the previous versions of the Attorney General's Guidelines. Moreover, although it is impossible to forecast the exact number of defendants who might be affected if this ruling were applied retroactively, estimates are that more than a thousand defendants are sentenced annually under Section 12. Accordingly, such an application would require the review of numerous sentences, resulting in a great number of sentencing hearings, and would impose a very substantial burden on the court system and the administration of justice.

We have, however, chosen to apply a limited retroactive effect to this case and those cases pending final appeal on the date this opinion is issued. The cases pending final appeal will have the same options, discussed below, as defendant in this case.

## V.

In this case, defendant Brimage was sentenced in Somerset County, pursuant to a negotiated plea agreement, to four years in prison with a three-year parole disqualifier, the statutorily prescribed minimum period of parole for a school zone drug offense. *N.J.S.A.* 2C:35–7. Defendant argues that his sentence should

have been vacated because of the fact that he might have received a different and lesser plea offer if he had been tried and convicted in another county. Defendant also argues that the Guidelines, as they stood at that time, mandate that he receive a sentence of probation conditioned on 364 days in county jail, for he believes that sentence to be the standard plea offer established by the 1992 Guidelines.

■ We agree that defendant's sentence should be vacated because of the impermissible intercounty disparity in plea offer policies. Defendant has the option of vacating his plea or renegotiating his plea. If he chooses the latter option, his plea shall be determined under the Attorney General's Guidelines as they stood at the time of his sentencing. If the State's plea offer is not in conformity with those Guidelines, the prosecutor must state on the record his or her reasons for departing from those Guidelines. However, as we recommended in *Gerns, supra,* we urge the prosecutor and the trial court to be particularly mindful of the disparity problem when reviewing defendant's plea agreement and sentence. 145 *N.J.* at 232, 678 *A.*2d 634.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.