**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3359-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DELSHON J. TAYLOR JR.,
a/k/a TAYLOR DELSHON,
and DJ,

    Defendant-Appellant.

_____

Argued January 24, 2024 - Decided April 24, 2024

Before Judges Currier, Susswein and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 18-07-0257.

Scott Michael Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Scott Michael Welfel, of counsel and on the briefs).

Matthew Morgan Bingham, Assistant Prosecutor, argued the cause for respondent (Kristin J. Telsey, Salem County Prosecutor, attorney; David M.

Galemba, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After we granted the State leave to appeal the trial court's order suppressing evidence because it was recovered following an illegal stop, we remanded for the court to apply the factors cited in State v. Williams (Williams I), 192 N.J. 1, 15 (2007). State v. Taylor, No. A-3303-18 (App. Div. Aug. 28, 2019) (slip op. at 9-10). On remand, the court considered the Williams I factors and denied defendant's suppression motion. Defendant appeals from the suppression order and the court's order upholding the prosecutor's denial of a waiver of the mandatory minimum Graves Act[1] sentence. We affirm.

I.

On November 15, 2017, Penns Grove police officer Travis Paul was on patrol driving through an apartment complex when he heard "shots fired." He "immediately called it out on the radio." Paul headed to the area of South Broad Street and "alerted other officers to canvas the area." When Paul heard another patrolman on the radio advising he was talking to two individuals on Smith Street, Paul drove there. However, as he was talking to those individuals, Paul

_____

[1] N.J.S.A. 2C:43-6(c).

heard dispatch report that a 9-1-1 caller had described shots fired in the area of South Broad Street. Paul then heard Sergeant Carmen Hernandez on the radio stating she was talking to three individuals on South Broad Street. Paul immediately drove to that location. He testified approximately five minutes had passed from the time he heard shots fired.

Hernandez was also on patrol that night and heard Paul make the "shots fired" call over the radio. She testified the call "simply stated that shots were fired near South Broad Street." Hernandez explained that Penns Grove is .91 square miles and South Broad Street "runs directly through the entire town, . . . from pretty much one end to the other."

Hernandez traveled down South Broad Street and saw three males walking on the sidewalk. She said two of them were "standing . . . near the sidewalk . . . close to the area [to which the officers were] called." Then a third male walked up to the group and a car pulled up. Hernandez stated the three individuals "were the only people in the area." Since it was "near the site" the police were called to, Hernandez turned around, parked her marked SUV, and approached the men. She testified it was "less than" a minute, "maybe seconds," from the time the call initially came over the radio.

As Hernandez approached the men, one of the males walked to the driver's side of the car and "tr[ied] to . . . walk" away. Because she was "unsure what was . . . happening," Hernandez called for backup. As she did so, Hernandez observed the car and the men start to move away. She then told the men she was detaining them because of the report of fired shots. Hernandez instructed a sheriff's officer and a Carney's Point sergeant who had arrived at the scene to stop the vehicle that had begun to drive away because she "was unsure what had taken place." Carney's Point patrolman Timothy Haslett stayed with Hernandez.

Hernandez patted down one of the individuals—Zaire Robinson. She stated she detained him because the officers

> weren't sure whether . . . [the three men] were involved in the . . . shots fired incident at the time, and he kept trying to walk away, and also the fact that he was the one that was . . . near the vehicle. [Robinson] kept reaching [into the driver's side of the car].

Hernandez was not sure whether Robinson had obtained something from the vehicle, and she wanted to ensure the individuals were not carrying weapons.

Haslett knew one of the individuals, Corey Mills, Jr., from "previous dealings with him," and approached him. Haslett told Mills he was going to pat him down, and Mills said he did not "know th[e] guy next to [him], he just walked up on [Mills] and [his] friend." Mills was referring to defendant. Haslett

4

told Mills he was going to pat him down for weapons, asked if he had anything on him Haslett "should be concerned with." Mills said no.

Hernandez and Paul stated, "the only reason" they patted the individuals down was because Hernandez was "investigating [the] shots fired call."

Paul testified that when he approached defendant, "[defendant] was walking away from [the] officers" and was "pac[ing] back and forth," which made Paul "nervous after hearing shots fired." According to Paul, defendant stated he wanted to go home, he did not do anything, and he did not have anything on him, which "alerted [Paul] as an officer," and he began to worry about his safety. When Paul reiterated he was going to pat defendant down for the officers' safety, defendant "took off running." Both Paul and Haslett ran after him.

Paul stated that during the chase, "it seemed as if [defendant] reached for his waistband and pulled out a handgun and threw it on the [pavement] and he continued to run." Paul looked at the dropped item as he ran by it and screamed out "gun, gun, gun." He was ultimately able to apprehend defendant.

Both Haslett and Hernandez confirmed that defendant took off running. Hernandez stated she heard Paul say, "don't run." Haslett told defendant to stop running, but he did not, and Haslett saw defendant "reach in to either a sweatshirt

5

pocket or somewhere in the front of his person." Haslett fell and saw defendant throw a black handgun to the curb. After the gun was retrieved, police discovered it was loaded with hollow point bullets.

II.

Defendant was charged in an indictment with: second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); fourth-degree obstructing the administration of law, N.J.S.A. 2C:29-1(a); fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1); and fourth-degree possession of prohibited devices (hollow point bullets), N.J.S.A. 2C:39-3(f)(1).

A.

Defendant moved to suppress the handgun, and the court held a hearing in October 2018. In addition to the officers' testimony, the court also watched the footage from the officers' body-worn cameras.

On November 2, 2018, the court denied defendant's motion to suppress in an oral and written decision. The court found the three officers were credible and their testimony was consistent with the body-worn camera footage. The court found that initially Hernandez intended to conduct a field inquiry, but it quickly turned into an investigative detention when she told the men they had to

remain at the scene while she waited for backup. The court stated that "[a]n investigative detention is justified only if the evidence, when interpreted in an objectively and reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur."

After considering the facts, the court concluded "that the State has demonstrated by a preponderance of the evidence that there was a reasonable and articulable suspicion that one or more of the men had engaged in, or been part of, the shots fired incident and thus an investigative detention was warranted." The court further found "that the officers had an objectively reasonable belief that one or more of [the three] men may have been armed." Therefore, the police were permitted to seize the gun after defendant threw it away. The court added that regardless of the legality of the investigative detention, "a person must . . . submit to a stop by police . . . because the resistance and fleeing puts officers and the public at risk." Because defendant discarded the weapon while obstructing the administration of law, the weapon was properly seized. The court denied the suppression motion.

A-3359-21

B.

Defendant moved for reconsideration, contending the court "erred in finding a reasonable suspicion for the investigative detention and Terry[2] frisk that followed." Defendant asserted a "defendant's actions after an investigative detention has occurred cannot be used post hoc to find reasonable suspicion that the stop was, in fact, lawful."

The court granted the motion for reconsideration in an oral decision on February 8, 2019, memorialized in a February 11, 2019 order and February 21, 2019 written memorandum. In granting reconsideration and the suppression motion, the court reiterated its finding that Hernandez conducted an investigative detention and the three men, including defendant, would not feel they were able to leave the scene. Differing from its initial decision, the court found Hernandez

> did not articulate a reasonable and particularized suspicion that these men had just engaged in conduct connected to the shots fired call. They simply happened to be in the area she was patrolling after hearing the call. [Hernandez] identified nothing about their conduct nor demeanor that justified an investigative detention.

---

2  Terry v. Ohio, 392 U.S. 1, 24-27 (1968).

A-3359-21

## III.

We granted the State leave to appeal and remanded for "the motion judge to apply the three factors cited in Williams [I] to the facts of this case." Taylor, slip op. at 9 (italicization omitted).

On remand, the court heard counsel's arguments on October 10, 2019, and issued an oral decision denying defendant's suppression motion.[3] The court again found that "the investigatory stop was unlawful because there was no reasonable and particularized suspicion . . . about why these three individuals were suspected to have been involved in the shots that were fired."

However, the court noted the issue was "whether there was attenuation between the unlawful stop and the recovery of the . . . handgun." After reviewing the facts in light of the Williams I factors, the court found defendant's flight from the scene was an attenuating circumstance. Therefore, even though it was an illegal investigative detention, defendant's subsequent flight and discarding of the handgun were sufficient actions to purge any taint from the illegal stop. The court denied defendant's motion to suppress.

---

[3] The decision was memorialized in an order the same day.

A-3359-21

IV.

During the course of the proceedings, defendant requested a waiver of the mandatory minimum sentence required under the Graves Act. The State denied the request in a February 12, 2020 letter. Although the State acknowledged defendant did not have any adult criminal convictions, it also noted defendant was noncompliant with the officers' instructions and he fled from the scene, resulting in a foot pursuit. During the pursuit, one of the officers fell, injuring his leg. Under the circumstances presented, the State found a Graves Act waiver was unwarranted.

On April 26, 2021, defendant pleaded guilty to count one. The State dismissed the remaining charges and recommended a sentence of five years' incarceration with three years and six months of parole ineligibility. The sentence was to run concurrently with another charge to which defendant later pleaded guilty.

During the July 16, 2021 sentencing hearing, the judge analyzed the aggravating and mitigating factors and concluded they were "in equipoise." The judge questioned the propriety of the recommended sentence, querying whether a five-year sentence with one year of parole ineligibility was more appropriate

given the lack of any prior criminal history. The hearing was adjourned for a week.

Thereafter, defendant moved "to override the State's [February 12, 2020] refusal of a Graves Act waiver." The court permitted the parties to brief the issue and asked the State to distinguish defendant's case from other matters in which the State granted a Graves Act waiver.

Following the sentencing hearing in June 2022, the court issued an oral decision. The court began by analyzing the aggravating and mitigating factors. The court gave "moderate weight" to aggravating factor three, N.J.S.A. 2C:44-1(a)(3), "[t]he risk that the defendant will commit another offense," and found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), "[t]he need for deterring the defendant and others from violating the law," applied. The court gave "moderate weight" to mitigating factor two, N.J.S.A. 2C:44-1(b)(2), "[t]he defendant did not contemplate that the defendant's conduct would cause or threaten serious harm"; "slight weight" to mitigating factor seven, N.J.S.A. 2C:44-1(b)(7), "[t]he defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense"; "moderate weight" to mitigating factor eight, N.J.S.A. 2C:44-1(b)(8), "[t]he defendant's conduct was the result of circumstances unlikely to

recur"; "slight weight" to mitigating factor nine, N.J.S.A. 2C:44-1(b)(9), "[t]he character and attitude of the defendant indicate that the defendant is unlikely to commit another offense"; "slight weight" to factor ten, N.J.S.A. 2C:44-1(b)(10), "[t]he defendant is particularly likely to respond affirmatively to probationary treatment"; and "moderate weight" to mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), "[t]he defendant was under 26 years of age at the time of the commission of the offense." Thus, the mitigating factors outweighed the aggravating factors.

The court then addressed the Graves Act waiver motion under a "patent and gross abuse of discretion" standard, which "requires the [c]ourt to view the [p]rosecutor's decision through the filter of the highly deferential standard of review," citing State v. Rodriguez, 466 N.J. Super. 71, 105 (App. Div. 2021). Guided by Rodriguez, the court noted that "a patent and gross abuse of discretion is not automatically established by finding one or two cases where similarly situated defendants were granted a waiver." The judge stated that her "conscience t[old] [her] that a [five-year sentence with three-and-a-half years of parole ineligibility] [wa]s the wrong sentence for this defendant. However, [a judge's] consci[ence] is not what our [j]udicial [s]ystem is based upon. It's based upon an application of the law as it is written." The judge recognized that if she

imposed a sentence of five years' imprisonment with one year of parole ineligibility, "[she] would be substituting [her] judgment for that of the [p]rosecutor's [o]ffice." The court concluded the State's determination to not grant the Graves waiver was not a patent and gross abuse of discretion. The court sentenced defendant in accordance with the plea agreement to five years imprisonment with three-and-a-half years of parole ineligibility.

V.

On appeal, defendant raises the following issues for our consideration:

> POINT I
> BECAUSE THE POLICE LACKED REASONABLE SUSPICION TO STOP AND FRISK DEFENDANT AND DEFENDANT'S FLIGHT DID NOT PURGE THE TAINT OF THE UNLAWFUL POLICE CONDUCT, THE MOTION COURT SHOULD HAVE GRANTED DEFENDANT'S MOTION TO SUPPRESS.
>
> A. The Motion Court Correctly Found That Hernandez Lacked Reasonable Suspicion For The Stop.
>
> B. Defendant's Flight Did Not Purge The Taint Of The Unlawful Police Conduct.
>
> POINT II
> BECAUSE THE PRESIDING JUDGE APPLIED THE WRONG STANDARD OF REVIEW TO THE PROSECUTOR'S REFUSAL TO APPROVE A GRAVES WAIVER AND THERE WAS SUFFICIENT EVIDENCE TO MEET THE APPROPRIATE ABUSE OF DISCRETION STANDARD, THIS COURT

13

SHOULD VACATE THE SENTENCE AND REMAND FOR RECONSIDERATION OF DEFENDANT'S MOTION TO OVERRIDE THE PROSECUTOR'S GRAVES WAIVER DENIAL.

A. The Presiding Judge Erroneously Evaluated The Prosecutor's Refusal To Consent To A Graves Waiver Under The "Patent And Gross Abuse Of Discretion" Standard But Should Have Applied The Ordinary "Abuse Of Discretion" Standard.

B. The State's Refusal To Approve A Graves Waiver Was Arbitrary And Capricious Because Its Initial Rejection Letter Failed To Follow The Directive, It Relied On The Inappropriate Factor Of Defendant's Arrests That Did Not Result In Conviction, And It Had Granted Waivers To Defendants In Worse Cases.

A.

We begin with defendant's contentions regarding the denial of his suppression motion. As stated in our decision following the interlocutory appeal, "[w]e presume[d] the investigatory stop in this case was unconstitutional." Taylor, slip op. at 7. We remanded for the trial court "to apply the three factors cited in Williams [I] to the facts of this case." Id. at 9 (italicization omitted).

On remand, the court again found the investigatory stop was unlawful as the officer lacked reasonable and particularized suspicion to detain defendant and the other individuals. However, after analyzing the Williams I factors, the

14                                                           A-3359-21

court found defendant's flight from the scene was an intervening circumstance that attenuated the unlawful stop from the seizure of the handgun.

Our review of a decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). "'Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when "those findings are supported by sufficient credible evidence in the record."'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). We defer to these factual findings because of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State. v. Johnson, 42 N.J. 146, 161 (1964)). "We ordinarily will not disturb the trial court's factual findings unless they are 'so clearly mistaken "that the interests of justice demand intervention and correction."'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). Our review of legal conclusions drawn from those facts is de novo. State v. Radel, 249 N.J. 469, 493 (2022).

"Under both the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, 'searches and seizures conducted without warrants issued upon probable cause are presumptively

A-3359-21

unreasonable and therefore invalid.'" Goldsmith, 251 N.J. at 398 (quoting Elders, 192 N.J. at 246). Therefore, the State must prove by a preponderance of the evidence that the warrantless search or seizure falls within one of the "'"well-delineated exceptions"'" to the warrant requirement." State v. Shaw, 213 N.J. 398, 409 (2012) (quoting State v. Frankel, 179 N.J. 586, 598 (2004), overruled in part by State v. Edmonds, 211 N.J. 117 (2012)).

A Terry stop is one exception to the warrant requirement as it "involves a relatively brief detention by police during which a person's movement is restricted." Goldsmith, 251 N.J. at 399. Such an investigatory stop may be made without a warrant "'if it is based on "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion of criminal activity.'" Ibid. (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). An officer may frisk or pat down an individual for weapons if the officer has reason to believe the individual is armed and dangerous. State v. Legette, 227 N.J. 460, 472-73 (2017).

In our prior decision we accepted the court's conclusion that this was an unlawful Terry stop. The officer and the 9-1-1 caller merely heard and reported shots being fired somewhere nearby. There was no description or identification of the person who fired the shots, or a precise location. Hernandez had no

16

reasonable or particularized suspicion to suspect defendant was involved in the shots fired incident. Merely being in the area is not sufficient grounds for an investigatory detention. See Goldsmith, 251 N.J. at 403 n.6.

However, in Williams I, the Court considered similar circumstances to those present here and held that even if officers conduct an unconstitutional Terry stop, if a suspect "[o]bstruct[s] the police," it "constitute[s] a break in the chain from the investigatory stop." 192 N.J. at 10. In Williams I, one of the officers approached the defendant and requested that he place his hands on his head so they could pat him down for safety purposes. Id. at 5. The defendant then pushed the officer and began to flee. Ibid. When the officers caught up to the defendant, and apprehended him, they discovered a handgun in his waistband. Ibid.

The Court stated that "[t]he taint from [an] initial stop [i]s significantly attenuated by [a] defendant's criminal flight." Id. at 10. Therefore, physical evidence seized after the flight was not subject to suppression under the exclusionary rule. Id. at 10-11. The Court explained that because the chain of causation in such circumstances has been broken, the exclusionary rule does not apply. Ibid.

17

In Williams I, the Court termed the constitutionality of the initial investigative stop as "doubtful." Id. at 10. However, when the defendant disregarded the officer's instructions and began to flee, the Court found the officers had probable cause to believe he violated the obstruction statute. Id. at 13. In addition, the Court stated the officers "were acting in good faith and under color of their authority" because they responded reasonably to the radio dispatch in a high-crime area. Ibid. However, if the officers "'without any basis arbitrarily detaine[d] a person on the street,'" that "would have taken th[e] case outside the purview of the obstruction statute." Ibid. (first alteration in original) (quoting State v. Crawley, 187 N.J. 440, 461 n.8 (2006)).

The Court has previously held that evidence will not be suppressed "when the connection between the unconstitutional police action and the evidence becomes '"so attenuated as to dissipate the taint"' from" an unlawful investigatory stop. State v. Badessa, 185 N.J. 303, 311 (2005) (quoting Murray v. United States, 487 U.S. 533, 536-37 (1988)).

The Williams I Court considered three factors to determine whether seized evidence has been "sufficiently attenuated from the taint of a constitutional violation": "(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the presence of intervening circumstances; and (3) the

flagrancy and purpose of the police misconduct." 192 N.J. at 15 (quoting State v. Johnson, 118 N.J. 639, 653 (1990)).

The first factor, "temporal proximity[,] 'is the least determinative' factor." Id. at 15-16 (quoting State v. Worlock, 117 N.J. 596, 622-23 (1990)). "'The second factor, intervening events, "can be the most important factor in determining whether [evidence] is tainted."'" Id. at 16 (alteration in original) (quoting Johnson, 118 N.J. at 656). Lastly, the third factor "is 'particularly' relevant." Worlock, 117 N.J. at 624.

The Williams I Court concluded the "[d]efendant's resistance to the pat down and flight from the police . . . was an intervening act—the crime of obstruction—that completely purged the taint from the unconstitutional investigatory stop." 192 N.J. at 18.

On remand here, the trial court analyzed the Williams I factors as directed. In addressing the first factor, the court found the time between the stop and the seizure of the gun was very close. Therefore, this factor weighed in favor of defendant. As to the second factor, the court concluded defendant's disregard of the officer's instruction and fleeing the scene was an intervening circumstance and weighed in favor of the State. Lastly, the court found there was no misconduct displayed by Hernandez in detaining defendant.

19

Weighing the three factors, the judge found the facts were "remarkably similar to the circumstances in <u>Williams [I]</u> where the fleeing was found to be an attenuating circumstance." Therefore, the court denied defendant's motion to suppress.

Defendant asserts the trial erred in its analysis, specifically its finding that there was an intervening circumstance that attenuated the illegal stop from the seizure of the handgun. We disagree.

Defendant suddenly ran from police, causing two of them to pursue him on foot. One of the officers fell during the chase, injuring his leg. While running, defendant threw a loaded handgun to the ground. Running with a loaded gun with a bullet in the chamber and then throwing it away were all acts that "posed a risk of physical injury to police officers and . . . members of the public." <u>State v. Williams</u>, 410 N.J. Super. 549, 563 (App. Div. 2009). We are satisfied defendant's intervening criminal acts broke the chain of causation between the unlawful stop and the seizure of evidence. The flight and attendant actions were sufficiently attenuated from the stop to dissipate the taint of the unconstitutional action.

As to the third factor, the same judge conducted the suppression hearing, ruled on the motions, and handled the remand. On each occasion, the judge

found no evidence that any of the officers involved in these events acted with flagrant misconduct. The court described the testifying officers as credible, and their body-worn camera footage corroborated their versions of the events. We see no grounds upon which to disturb the court's finding on factor three. See Williams I, 192 N.J. at 16 ("[E]ven though the officers may have acted mistakenly, they did so in good faith.").

On remand, the trial court concluded the Williams I factors weighed in favor of suppressing the handgun. For the reasons stated, we affirm the order denying defendant's suppression motion.

B.

We turn to defendant's contention that the court applied the wrong legal standard in reviewing the denial of a Graves Act waiver. Defendant asserts the decision should be reviewed for an abuse of discretion, not for a "patent and gross abuse of discretion."

"The [Graves] Act makes the use or possession of a firearm during the commission, attempted commission, or flight from the commission of certain designated offenses a sentencing factor that triggers the imposition of a mandatory term of imprisonment." State v. Benjamin, 228 N.J. 358, 367 (2017) (alteration in original) (quoting State v. Franklin, 184 N.J. 516, 529 (2005)).

21

The purpose of the Graves Act is "to deter individuals from committing firearm-related crimes by calling for a mandatory minimum term of imprisonment for those convicted of Graves Act offenses."  Id. at 368 (citing State v. Des Marets, 92 N.J. 62, 71 (1983)).

However, the Graves Act includes "a limited exception that allows certain first-time offenders to receive a reduced penalty if the imposition of a mandatory term would not serve the interests of justice."  Ibid.  This exception states:

> On a motion by the prosecutor made to the assignment judge that the imposition of a mandatory minimum term of imprisonment under (a) subsection c. of N.J.S.[A. ]2C:43-6 for a defendant who has not previously been convicted of an offense under that subsection, or (b) subsection e. of N.J.S.[A. ]2C:39-10 for a defendant who has not previously been convicted of an offense under chapter 39 of Title 2C of the New Jersey Statutes, does not serve the interests of justice, the assignment judge shall place the defendant on probation pursuant to paragraph (2) of subsection b. of N.J.S.[A. ]2C:43-2 or reduce to one year the mandatory minimum term of imprisonment during which the defendant will be ineligible for parole.  The sentencing court may also refer a case of a defendant who has not previously been convicted of an offense under that subsection to the assignment judge, with the approval of the prosecutor, if the sentencing court believes that the interests of justice would not be served by the imposition of a mandatory minimum term.
>
> [N.J.S.A. 2C:43-6.2.]

"In 2008, the New Jersey Attorney General issued a directive 'to ensure statewide uniformity in the exercise of prosecutorial discretion in implementing' the Graves Act." Benjamin, 228 N.J. at 369 (quoting Attorney General Directive to Ensure Uniform Enforcement of the "Graves Act" § 6(a), at 10 (rev. Nov. 2008) [hereinafter Directive]. The Directive "provides clear parameters for prosecutors contemplating a waiver," and while occasionally "prosecutors in different counties may reach different Graves Act waiver conclusions, [the courts] have recognized that some disparity in sentencing is inevitable." Id. at 372 (first citing Directive, § 6, at 10-15; and then citing State v. Brimage, 153 N.J. 1, 22 (1998)). "[T]he Directive requires prosecutors to 'document in the case file [their] analysis of all the relevant aggravating and mitigating circumstances.'" Ibid. (alteration in original) (quoting Directive, § 6(d), at 13).

"[B]ecause the State is obligated to provide the case-specific files containing its statement of reasons to the assignment judge to consider in assessing the prosecutor's conduct," the assignment judge is permitted to "maintain[] those files and rely[] on them in evaluating 'the prosecutor's . . . decision[].'" State v. Andrews, 464 N.J. Super. 111, 123 (App. Div. 2020) (quoting Benjamin, 228 N.J. at 373). "[T]he comparative analysis the trial court conduct[s]—examining past cases where the prosecutor had granted Graves Act

waivers—is a legitimate component of the robust judicial review needed to ensure that a prosecutor's rejection of a Graves Act waiver" is not unconstitutionally arbitrary. Rodriguez, 466 N.J. Super. at 92. An assignment judge may delegate their authority to the Criminal Part presiding judge. See State v. Nance, 228 N.J. 378, 392 (2017); see also R. 1:33-6(a)).

Defendant's charge of unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b), subjected him to a mandatory minimum sentence of "one-half of the sentence imposed by the court or [forty-two] months, whichever is greater." N.J.S.A. 2C:43-6(c). After defendant moved to "override" the State's decision, the State submitted a brief analyzing the aggravating and mitigating factors. In addition, during the sentencing hearing, the State discussed more than a dozen cases in which it had sought a Graves Act waiver, and distinguished defendant's circumstances from those matters.

After reviewing the State's decision for patent and gross abuse of discretion, the trial court denied defendant's application to override the denial of a Graves Act waiver. We see no error.

The precedential case law establishes patent and gross abuse discretion as the appropriate standard. See Benjamin, 228 N.J. at 364 (permitting a "defendant[] to appeal the denial of a waiver to the assignment judge upon a

showing of patent and gross abuse of discretion by the prosecutor"); <u>see also</u> <u>Rodriguez</u>, 466 N.J. Super. at 87 (finding the "defendant failed to establish that the prosecutor's rejection of his request for a Graves Act waiver constituted a patent and gross abuse of discretion").

As the trial court stated, the prosecutor's denial "[wa]s entitled to great deference and the [c]ourt [did] not substitute its judgment for that of the [p]rosecutor." To the extent we have not commented on any further arguments raised by defendant, we conclude they lack "sufficient merit to warrant discussion in a written opinion." <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25

A-3359-21